Kevin Wayne DUNLAP, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000226–MR.

Supreme Court of Kentucky.

June 20, 2013.

As Modified Feb. 20, 2014.

Rehearing Denied Feb. 20, 2014.

538

Shannon Renee Dupree, Assistant Public Advocate, Roy Alyette Durham, II, Assistant Public Advocate, Kathleen Kallaher Schmidt, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, David Bryan Abner, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

Appellant, Kevin Wayne Dunlap, pled guilty to three counts each of capital murder, capital kidnapping, and tampering with physical evidence, and one count each of attempted murder, first-degree kidnapping, first-degree rape, first-degree arson, and first-degree burglary. The Livingston

Circuit Court sentenced Appellant to death for each of the six capital crimes; life imprisonment for kidnapping, rape, and arson; twenty years' imprisonment for attempted murder and burglary; and five years' imprisonment for each of the tampering convictions. He now appeals as a matter of right. Ky. Const. § 110(2)(b). We affirm.

## I. BACKGROUND.

On October 15, 2008, Appellant approached Kristy Frensley while she was working in her yard. Kristy's house was for sale and Appellant asked if she would show it to him. Once inside, Appellant put a gun to her head, zip tied her hands and ankles, and moved her to her bedroom. Shortly thereafter, Kristy's three children, Kayla Williams, 17, Kortney Frensley, 14, and Ethan Frensley, 5, returned home from school. Appellant pushed all three children into the bedroom and tied Kayla and Kortney with zip ties and Ethan with pantyhose. He then took the children to a different part of the house.

Appellant returned to Kristy's bedroom and raped her. After giving her a shower, he placed Kristy in her bed, began to strangle her, and attempted to smother her with a pillow. After that, he began cutting her neck. He briefly left the room; when he returned he stabbed Kristy in her left ear and twice in her lower back. Kristy later learned that Appellant had broken off a butter knife in her neck at the handle that had to be surgically removed. Kristy pretended that she was dead by lying still and slowing her breathing. Appellant covered her with a blanket and left the room. Feeling smothered by the blanket, Kristy moved so that her nose was uncovered and she could see.

Appellant poured flammable liquid on the floor of the bedroom and set the bedroom on fire. From her position, Kristy could see Ethan across the hall lying on a pile of pillows. Kristy attempted to rescue him but before she could do so her foot caught fire. She then discovered her legs were not functioning properly and rolled off of her bed to the bedroom's French doors which led to the pool deck. She pulled one of the door handles with her foot but her legs failed her again and she got stuck in the doorframe. Eventually, with her hands still tied, she managed to roll into the pool where a Sheriff's deputy later found her.

The fire caught the attention of neighbors and passers-by and Kayla's body was seen through a window; they punched out the window with their fists and pulled her body outside. The fire was so hot that when they pulled her body out her skin came off in their hands. Kayla's hands were still tied and her mouth was gagged with pantyhose; her throat had been cut from ear to ear, deep enough that her trachea was visible. A steak knife blade was protruding from her back through her sweater. Remarkably, Kayla was still alive, gasping for breath and gurgling. Two women attempted CPR, but Kayla died in the yard from her wounds.

The fire destroyed the home, burning Kortney and Ethan's bodies. An autopsy revealed that Ethan had two stab wounds to the chest (including one that penetrated his heart), six stab wounds to his back and one to his stomach. Kortney had three stab wounds to her chest that penetrated the left lung and one stab wound to the right side of the neck. The doctor who performed the children's autopsies testified that all three children died from stab wounds.

Based on an eyewitness description of a vehicle seen at the Frensley's house that day, a search warrant was issued for Appellant's home. Law enforcement officers seized several items linking him to the

Frensley massacre. Forensic analysts at the Kentucky State Crime Lab examined the seized items and a "rape kit" that medical personnel had performed on Kristy. A vaginal swab revealed that DNA inside Kristy matched Kevin Dunlap.[1] The analyst also discovered DNA on the driver's side seatbelt of Appellant's truck that matched Kristy's.[2] Additionally, Kortney's DNA was found on Appellant's tennis shoes.[3]

Appellant was indicted by a Trigg County Grand Jury for three counts each of capital murder, capital kidnapping, and tampering with physical evidence; and one count each of attempted murder, first-degree burglary, first-degree arson, and first-degree rape. Upon joint motion by the Commonwealth and Appellant, the Trigg Circuit Court granted a change of venue to the Livingston Circuit Court. Thereafter, the Commonwealth's Attorney gave notice that he was seeking the death penalty.

Two months prior to trial, Appellant was sent to the Kentucky Correctional Psychiatric Center (KCPC) for a thirty-day evaluation of his competency to stand trial and criminal responsibility. The Livingston Circuit Court held a competency hearing on January 22, 2010, approximately three weeks prior to the trial date. The court heard the testimony of Dr. Amy Trivette, the psychiatrist supervising Appellant's evaluation at KCPC, who testified that Appellant understood the nature and consequences of the charges against him and had a general understanding of the courtroom proceedings and the individuals involved. Consistent with this testimony,

the trial court found Appellant competent to stand trial.

About one month prior to trial, a CT scan revealed two non-specific hyper-attenuated punctuate foci—essentially, abnormal spots—on the right frontal lobe of Appellant's brain. Defense counsel requested a PET scan and an MRI, and moved the trial court for a continuance so the results of these tests could be fully examined. The trial court permitted the tests but denied the continuance. About a week before trial was to begin, the tests revealed that Appellant had an arterial venous malformation (AVM) on his right frontal lobe, measuring approximately one cubic inch—a tangle of arteries and veins existed where cortical matter would be on a normally-developed brain.

The day before jury selection was to begin, Appellant informed the court that he wanted to change his plea from Not Guilty to Guilty but Mentally Ill (GBMI). He also informed the court that if it did not accept his GBMI plea then he wished to enter a plea of Guilty. In light of the newly discovered AVM, defense counsel moved to stay the proceedings and have Appellant reevaluated. After hearing testimony from Appellant's expert witness, Dr. Michael Nicholas, the trial court denied counsel's request to stay the proceedings, rejected Appellant's request to plead GBMI, and accepted his Guilty plea.

Appellant reserved his right to be sentenced by a jury for his capital convictions, and a capital sentencing proceeding began on February 10, 2010, lasting two weeks. After deliberating for three hours, the jury recommended a death sentence on each of

---

**1.** The possibility of the DNA belonging to some other individual was 1 in 120 quintillion (120,000,000,000,000,000,000).

**2.** The chance of error was 1 in 130 quintillion (130,000,000,000,000,000,000).

**3.** The chance of error was 1 in 12 quintillion (12,000,000,000,000,000,000).

the capital offenses; the trial court adopted its recommendation. Appellant waived jury sentencing on the non-capital charges, and the trial court sentenced him to life imprisonment for kidnapping, rape, and arson; twenty years' imprisonment for attempted murder and burglary; and five years' imprisonment for each of the tampering convictions. The twenty-year sentences and the five-year sentences were to run consecutively to one another, for a total of fifty-five years, and concurrently with the life sentences which, by law, must run concurrently with one another. *Mabe v. Commonwealth,* 884 S.W.2d 668, 673 (Ky.1994) (*citing Bedell v. Commonwealth,* 870 S.W.2d 779, 783 (Ky.1993)). Additional facts will be provided where relevant to our analysis.

## II. STANDARDS OF REVIEW.

■ Appellant seeks review of twenty-one related issues (plus a separate "cumulative error" argument), "some of which comprise numerous sub-issues, and many of which were not preserved for review pursuant to RCr 9.22 or 9.54." *Sanders v. Commonwealth,* 801 S.W.2d 665, 668 (Ky. 1990). "Indeed, more than a few … were not even *raised* below." *Id.* Thus, in other instances they would be treated as unpreserved. However, "[w]here the death penalty has been imposed, we nonetheless review allegations of these quasi errors." *Id.*

[If] the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, *e.g.,* whether the failure might have been a legitimate trial tactic; [but] (2) if there is no [such] reasonable explanation, [we then address] whether the unpreserved error was prejudicial, *i.e.,* whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital

crime, or the death penalty may not have been imposed. All unpreserved issues are subject to this analysis.

*Id.* (internal citations omitted); *see also Johnson v. Commonwealth,* 103 S.W.3d 687, 691 (Ky.2003).

"The rationale for this rule is fairly straightforward. Death is unlike all other sanctions the Commonwealth is permitted to visit upon wrongdoers." *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky. 1999). Thus, the invocation of the death penalty requires a more expansive standard of review than is normally necessary in the criminal justice process. *Id.; see also* KRS 532.075(2) ("The Supreme Court shall consider … any errors enumerated by way of appeal.").

■ Preserved errors are reviewed under normal standards. As noted in *Brown v. Commonwealth,* "preserved evidentiary and other non-constitutional errors will be deemed harmless under RCr 9.24 and *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), if we can say with fair assurance that the judgment was not substantially swayed by the error." 313 S.W.3d 577, 595 (Ky.2010). "Our inquiry is not simply 'whether there [is] enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (*quoting Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239). "As to those preserved constitutional errors which are subject to harmless error review, they must be shown to be 'harmless beyond a reasonable doubt' in order to be deemed harmless." *Id.*

■ Moreover, we review a trial court's evidentiary rulings for an abuse of discretion. *Penman v. Commonwealth,*

194 S.W.3d 237, 245 (Ky.2006). "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

■ On appellate review of a trial court's denial of a motion to suppress, we apply the two-step process set out in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and adopted by this Court in *Adcock v. Commonwealth*, 967 S.W.2d 6 (Ky.1998). We review the trial court's findings of fact under the substantial evidence standard. *Id.* at 8. Under this standard, the trial court's findings of fact will be deemed conclusive if supported by substantial evidence. RCr 9.78. Finally, we conduct a *de novo* review of the trial court's application of the law to the established facts to determine whether its ruling was correct as a matter of law. *Welch v. Commonwealth*, 149 S.W.3d 407, 409 (Ky.2004).

### III. ANALYSIS.

#### A. The Trial Court Properly Accepted Appellant's Guilty Plea.

Appellant first argues that the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it rejected his GBMI plea, denied his requests for a continuance and a second competency evaluation, accepted his guilty plea, and asked him to admit to the statutory aggravating circumstances.

On the day before jury selection was to begin, Appellant informed the trial court that he wanted to change his plea from Not Guilty to GBMI, but added that if the trial court did not accept his GBMI plea, then he wished to plead Guilty. He asked to enter this plea against the advice of his attorneys who stated that in their opinion, the decision was not knowingly, intelligently, and voluntarily made, but was instead the product of mental illness—specifically, a previously diagnosed depressive disorder and organic brain damage. The trial court conducted a plea colloquy, heard evidence regarding mental illness, and ultimately concluded that Appellant was competent to enter a new plea. It further concluded that Appellant was not suffering from a mental illness at the time of the murders; it therefore rejected the GBMI plea and accepted the Guilty plea.

Central to Appellant's argument to this Court is the AVM found on his brain six days before he changed his plea. He argues that its discovery "had the potential to change everything. It also had the potential to explain a lot about [his] behavior and mental state, past and present." This, he argues, is because the location of the AVM—the right frontal lobe—is the part of the brain associated with self-control, impulses, and judgment. As such, he contends that (1) he was incompetent to enter a guilty plea, (2) even if he was competent the guilty plea was not knowingly and voluntarily made, (3) the trial court should have granted his requests for a continuance and a new competency hearing, and (4) the trial court erroneously asked him to admit to the aggravating circumstances.

#### 1. Appellant was Competent to Enter a Guilty Plea.

First, Appellant argues that he was incompetent to enter a guilty plea.[4] Specifi-

---

4. He appears to argue generally that the very fact that he waived his rights and entered a guilty plea to capital offenses evinces a lack of competence. Having rejected this argument in *Chapman v. Commonwealth*, 265 S.W.3d 156, 175–76 (Ky.2007), we decline to address it here.

cally, he suggests that the abnormality in his brain substantially affected his judgment and the capacity to waive his rights. This issue is preserved.

▮ "A criminal defendant may not be tried unless he is competent[,] *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966), and he may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently,' *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461 (1938). . . ." *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). "A competency determination is based on the preponderance of the evidence standard. We may disturb a trial court's competency determination only if the trial court's decision is clearly erroneous (*i.e.,* not supported by substantial evidence)." *Chapman,* 265 S.W.3d at 174 (footnotes and citations omitted).

▮ As an initial matter, we must decide what factual standard for determining competency applies to Appellant's situation. In most scenarios, the test for determining competency to plead guilty is the same as determining competency to stand trial: "whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). *See also Godinez,* 509 U.S. at 398, 113 S.Ct. 2680 (rejecting "the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard"); *Chapman,* 265 S.W.3d at 175 (same). The trial court applied the *Dusky* standard in determining that Appellant was competent to enter his guilty plea.

▮ However, in *Chapman* we held that a different, heightened standard of determining competency applies under a very narrow (and rare) set of circumstances, *i.e.,* "when a defendant desires to plead guilty, waive jury sentencing and presentation of mitigation evidence, and asks the trial court to be sentenced to death." *Id.* at 180. That standard, adopted from *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), requires the trial court to determine whether the defendant "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Chapman,* 265 S.W.3d at 179 (*quoting Rees,* 384 U.S. at 314, 86 S.Ct. 1505).

Appellant argues that the circumstances surrounding his guilty plea are sufficiently analogous to those in *Chapman* to warrant application of the heightened *Rees* standard. He contends that his failure to *affirmatively* seek the death penalty (as the appellant in *Chapman* had) is irrelevant. Rather, he alleges that the consequence of his decision to waive his right to a jury trial, plead guilty to six capital offenses, and admit to three aggravating circumstances that made him death-eligible "was exactly the same as if he had told the trial court he wanted a death sentence." We disagree.

Our holding in *Chapman* makes clear that the heightened *Rees* standard applies to one situation: "when a defendant desires to plead guilty, waive jury sentencing and presentation of mitigation evidence, and asks the trial court to be sentenced to death." *Id.* at 180. We have not extended application of the *Rees* standard to any other factual scenario.[5] *See id.; Windsor*

---

5. We acknowledge that the *Rees* standard of

determining competency also applies to the

*v. Commonwealth,* 413 S.W.3d 568, 571–72 (Ky.2010).[6] Here, Appellant pled guilty but he did *not* waive jury sentencing or presentation of mitigation evidence, and he did not ask the trial court to be sentenced to death. We are not persuaded that pleading guilty to a capital crime (or even several capital crimes) and admitting to aggravating circumstances is the equivalent of asking the trial court for the death penalty; indeed, pleading guilty constitutes sound legal strategy in some cases. Thus, we conclude application of the *Rees* standard is not appropriate in this case.

■■■ Accordingly, Appellant was competent to enter a guilty plea if the trial court was satisfied by a preponderance of the evidence that he "ha[d] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [that] he ha[d] a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402, 80 S.Ct. 788. Under this standard, the trial court found that Appellant was indeed competent to enter a guilty plea. This finding is supported by substantial evidence.

The trial court held a competency hearing on January 22, 2010, at which Dr. Trivette, the KCPC psychiatrist who supervised Appellant's month-long evaluation, offered substantial testimony. She concluded that, to a reasonable degree of medial certainty, Appellant understood the nature and consequences of the proceedings against him and had a general understanding of the courtroom proceedings and the individuals involved. She also stated that he was able to assist his counsel and rationally participate in his own defense.

A mere eighteen days later—and the day before jury selection was to begin—Appellant asked to enter a plea of GBMI, or if rejected, Guilty.[7] The trial court conducted a plea colloquy and heard evidence on Appellant's mental illness. The following exchange from the plea colloquy is informative:

> *Trial court:* [T]oday, do you think you understand what we're doing here today?
>
> *Appellant:* Yes, sir.
>
> *Trial court:* Is it your belief that your judgment is clear and that you understand what we're about to go through in this question and answer session?
>
> *Appellant:* Yes, sir.
>
> *Trial court:* While we're still on the question of mental illness, disease, or defect which, as I mentioned earlier, we

---

factual scenario presented by the *Rees* case itself—*i.e.,* when a death row inmate seeks to withdraw his or her habeas appeal. 384 U.S. at 313–14, 86 S.Ct. 1505. *See also Awkal v. Mitchell,* 174 Fed.Appx. 248, 249 (6th Cir. 2006).

6. *Windsor* is the only other case in which we have cited *Rees.* In *Windsor,* we noted that the trial court should have applied the *Rees* standard to a defendant who announced his desire to plead guilty and seek the death penalty. 413 S.W.3d at 571–72. As in *Chapman,* the appellant in *Windsor* also waived jury sentencing and unsuccessfully attempted to prevent his attorneys from presenting mitigation evidence. *Id.* at 570–71. Accordingly, the appellant in *Windsor* satisfied all of the

criteria we announced in *Chapman* for application of the *Rees* standard. *See id.* Although our disposition in *Windsor* is final, the mandate has yet to be issued for other reasons.

7. Appellant's motion included the following language:

> I am entering a plea of "guilty but mentally ill" subject to the court's acceptance of the same. Should the court not accept a plea of "guilty but mentally ill," then I enter a plea of "guilty." In no event am I waiving my right to have a sentence imposed by a jury. All references to "guilty" in this form shall be considered "guilty but mentally ill" subject to the court's acceptance.

will discuss more directly, I want to get a little bit more from you. You heard Dr. Trivette's testimony that she believed that you were competent to stand trial. Do you agree with that?

*Appellant:* Yes, sir, I'm competent.

*Trial court:* And have you understood all the proceedings here in court up 'til today and including today so far?

*Appellant:* Yes, sir.

*Trial court:* Do you believe that if you did not enter a guilty plea you would be able to assist your counsel in a trial in the guilt phase of this case, and, assuming I accept a guilty plea, do you think you can assist your counsel in a sentencing phase of this case?

*Appellant:* Yes, sir.

*Trial court:* So, as far as you're standing there now, is it your belief that your judgment is not impaired at this time?

*Appellant:* That is correct.

Later in the hearing, the defense's own expert witness, Dr. Nicholas, stated that he "never had an issue with [Appellant's] competency to stand trial." [8] As previously mentioned, under the facts of this case the standards for determining competency to stand trial and competency to enter a guilty plea are identical, *see Dusky,* 362 U.S. at 402, 80 S.Ct. 788; *Chapman,* 265 S.W.3d at 175, and if he was competent to stand trial—as all parties agreed he was— *a fortiori* he was competent to enter a guilty plea. Thus, the trial court's finding that Appellant was competent to reject the advice of his attorneys and enter a guilty plea was based on substantial evidence— Appellant's opinion, Dr. Trivette's opinion, Dr. Nicholas's opinion, and the court's own observations during its colloquy—and it is therefore not clearly erroneous.

## 2. Appellant's Waiver was Knowing and Voluntary.

■ Appellant next argues that even if he was competent to enter his plea, he did not do so knowingly and voluntarily. He contends that the trial court's colloquy was insufficient to determine whether he understood and appreciated the rights he was waiving. This issue is preserved. Whether a defendant's plea is knowing and voluntary "is inherently fact-sensitive, thus this Court reviews such a determination for clear error, *i.e.,* whether the determination was supported by substantial evidence." *Edmonds v. Commonwealth,* 189 S.W.3d 558, 566 (Ky.2006) (citations omitted).

On the morning of February 9, 2010, Appellant informed the trial court that he wished to change his plea from Not Guilty to GBMI, but if the court would not accept a GBMI plea, then he wished to plead Guilty. The trial court conducted a plea colloquy lasting approximately twenty-seven minutes, which included the following exchanges relevant to the question of whether Appellant's plea was knowing and voluntary:

*Trial court:* There's only one document today, which is a substantially-altered-to-fit-the-circumstances Motion to Enter a Guilty Plea. Were you able to read that document?

*Appellant:* Yes, sir.

*Trial court:* Have you ever suffered from any mental illness, disease, or defect that affects your ability to think or to reason?

---

8. Where Dr. Nicholas disagreed with Dr. Trivette concerned Appellant's criminal responsibility. Dr. Nicholas testified that the AVM could have rendered Appellant "mentally ill" under KRS 504.060(6) at the time the offenses were committed. This issue will be discussed in greater detail in Section III.C, *infra.*

558

*Appellant:* I don't really know how to answer that question, sir.

*Trial court:* All right, answer it the best you can.

*Appellant:* [appears to briefly consult with counsel] Yes.

*Trial court:* All right, and tell me what that is.

*Appellant:* Apparently I have a spot on my brain that affects my judgment.

*Trial court:* All right, and is that based on the recent MRI and PET scan diagnostics that you had?

*Appellant:* Yes.

*Trial court:* All right, before that, had you ever been diagnosed with any mental illness, disease, or defect that affects your ability to think or to reason.

*Appellant:* Depression would probably affect my reasoning.

*Trial court:* All right did you treat your depression occasionally through prescribed medicine?

*Appellant:* Yes, sir.

*Trial court:* Okay, and did that help?

*Appellant:* Sometimes.

*Trial court:* All right. I guess more to the point today, do you think you understand what we're doing here today?

*Appellant:* Yes, sir.

*Trial court:* Is it your belief that your judgment is clear and that you understand what we're about to go through in this question and answer session?

*Appellant:* Yes, sir.

*Trial court:* While we're still on the question of mental illness, disease, or defect which, as I mentioned earlier, we will discuss more directly, I want to get a little bit more from you. You heard Dr. Trivette's testimony that she believed that you were competent to stand trial. Do you agree with that?

*Appellant:* Yes, sir, I'm competent.

*Trial court:* And have you understood all the proceedings here in court up 'til today and including today so far?

*Appellant:* Yes, sir.

*Trial court:* Do you believe that if you did not enter a guilty plea you would be able to assist your counsel in a trial in the guilt phase of this case, and, assuming I accept a guilty plea, do you think you can assist your counsel in a sentencing phase of this case?

*Appellant:* Yes, sir.

*Trial court:* So, as far as you're standing there now, is it your belief that your judgment is not impaired at this time?

*Appellant:* That is correct.

. . . .

*Trial court:* All right. As you know, a Trigg County grand jury has charged you with several offenses. And there is no short-hand way to do this, so I'm simply going to read them, Mr. Dunlap. Under Count 1, the grand jury charged that on or about October 15, 2008 in Trigg County, you did and with intent to cause the death of another person, caused the death of Kayla Williams. That's a capital offense, and I'm just going to summarize, on each of these capital offenses, once for all, as you know the range for the punishment on a capital offense is from a term of not less than twenty years to no more than fifty years; or it can be a term of life imprisonment; it can be a term of life without probation or parole for a period of twenty-five years; it can be a term of imprisonment for life without benefit of probation or parole at all; and then finally it can be the death penalty. You understand that's the range for capital offenses?

*Appellant:* Yes, sir.

*Trial court:* [Trial court goes on to read each count, explaining the penalty range

for each class of felony with which Appellant was charged.] That's the charges with which you stand here charged. Do you understand that those are those charges?

*Appellant:* Yes, sir.

*Trial court:* Now let me add to those the aggravating factors that the Commonwealth filed by notice that was recorded on January 6, 2009—that the offense of murder was committed upon each minor while the defendant was engaged in the commission of arson in the first degree, burglary in the first degree, and rape in the first degree. The second aggravating circumstance being that the defendant's acts of killing the aforementioned was intentional and resulted in multiple deaths. And the third aggravator is the offenses of kidnapping perpetrated against the minors and their mother, Kristy Frensley, were committed while the defendant was engaged in the commission of the crimes of arson in the first degree, burglary in the first degree, rape in the first degree, and murder in the first degree. Are you also aware that those are the aggravating factors that make the capital offenses punishable potentially by the death penalty?

*Appellant:* Yes, sir.

*Trial court:* And is there anything about any of those charges that you don't understand? Or the aggravators for that matter?

*Appellant:* No, sir.

*Trial court:* And you understand the facts from which those charges arose— in other words, why you got charged with those offenses.

*Appellant:* Yes, sir.

*Trial court:* Is there anything you don't understand about the facts from which those charges arose?

*Appellant:* No, sir.

*Trial court:* Have your attorneys explained to you the nature of these charges and the penalties they carry as well as any possible defenses to any of these charges?

*Appellant:* Yes, sir.

*Trial court:* And I also know that your attorneys have discussed with you your constitutional rights but I want to remind you that you do have the right to a speedy and public trial by jury, where the Commonwealth would have to prove your guilt beyond a reasonable doubt. You have the right to confront and cross-examine any witnesses who are called to testify against you as well as the right to compel the attendance of witnesses in your own behalf. You have the right to not testify against yourself—you don't have to incriminate yourself. You have the right to a jury trial on sentencing after the entry of this guilty plea. If you have a trial and you're convicted, you have a right to appeal that conviction to a higher court and if you can't afford a lawyer at that stage in the proceedings the court would appoint one for you. So do you understand all of those rights, Mr. Dunlap?

*Appellant:* Yes, sir.

*Trial court:* And do you also understand that by entering a guilty plea today— whether it is Guilty but Mentally Ill, or whether it's just Guilty—that you give up those rights that I just mentioned.

*Appellant:* Yes, sir.

*Trial court:* Do you also understand that statements you make here today are against your right to self-incriminate; that is, statements you make today may be used in a sentencing phase of a trial against you.

*Appellant:* Yes, sir.

*Trial court:* Do you think you've had sufficient time to discuss this matter with your lawyers?

*Appellant:* Yes, sir.

. . . .

*Trial court:* Now I know from what [your attorney] said before you and I began this discussion that you have talked with your attorneys about your plea of guilty today, and is it your understanding that they agree or disagree with your going forward with any plea today?

*Appellant:* I understand that they disagree.

*Trial court:* And despite that disagreement is it your wish to go ahead with a plea today?

*Appellant:* Yes, sir.

*Trial court:* Can you tell me why you would go against your attorney's advice and do that?

*Appellant:* It's what I feel is right.

*Trial court:* As I mentioned earlier the only plea document that we have is a Motion to Enter a Guilty Plea. It has your constitutional rights spelled out. It says many of the same things I've asked you about not being impaired by drugs and that you're prepared to voluntarily admit your guilt, subject to your claim of Guilty but Mentally Ill and unconditional otherwise. Did you have an opportunity to read this just before our session this morning?

*Appellant:* Yes, sir.

*Trial court:* Did you sign it here on the back?

*Appellant:* Yes, sir.

*Trial court:* And did you understand it before you signed it?

*Appellant:* Yes, sir.

*Trial court:* And did you sign it freely and voluntarily?

*Appellant:* Yes, sir.

*Trial court:* Do you also understand that the Commonwealth has made no agreement with you in return for a guilty plea today?

*Appellant:* Yes, sir.

*Trial court:* And so you understand that the penalties that I outlined earlier would come into play in the sentencing phase with your guilty plea today without any commitment by the Commonwealth to amend any charges or recommend any particular punishment?

*Appellant:* Yes, I understand.

. . . .

*Trial court:* As far as entry of a guilty plea, again, I'm simply going to go through these charges, beginning with Count 1, and ask you if you admit:

On or about October 15, 2008 in Trigg County, you intentionally caused the death of Kayla Williams by stabbing her and cutting her throat with a knife.

*Appellant:* Yes, sir.

*Trial court:* [Trial court reads charges 2 through 8; Appellant admits to committing the offenses alleged in each charge.] In relation to the kidnapping offenses, I want you to explain to me why you tied them up, bound them, and restrained them.

*Defense counsel:* Objection. We would object that that's unnecessary.

*Trial court:* All right, then let's approach it this way. Let me just address Mr. Dunlap. Have you talked with your lawyers about the kidnap exemption statute?

*Appellant:* Yes, sir.

*Trial court:* All right, and did they explain to you that if a person's criminal purpose is the commission of an offense outside of the kidnapping or other related charges, and if it occurs immediately with and incidental to the commission of

an offense outside KRS 509 [Kidnapping and Related Offenses], and that unless it exceeds that which is normally incident to the commission of the offense outside of KRS 509 that a person can claim that the kidnapping exemption[9] applies to that?

*Appellant:* Yes, sir.

*Trial court:* And let me ask counsel, and that's the purpose, so that I am assured that there is a factual basis to the kidnapping plea. You have discussed that with Mr. Dunlap?

*Defense counsel:* We have, Your Honor.

*Trial court:* And I'll leave it at that. I need not have the facts further based upon counsel's representation of having gone over that.

... Now back on Count 9, ... [trial court reads counts 9 through 14; Appellant admits to committing the offenses alleged in each charge].

. . .

[Trial court reads each aggravating factor and Appellant admits to each of them.]

*Trial court:* All right. Do you admit your guilt to those offenses and to those aggravators because you are guilty and for no other reason?

*Appellant:* Yes, sir.

*Trial court:* Knowing that you do have the constitutional rights that I went over earlier and that are set out in the Motion to Enter a Guilty Plea, and knowing that your guilty plea today is against the advice of your attorneys, is it still your desire to give up all those rights by entering those guilty pleas today and allow a jury to affix your punishment in the range allowed by law?

*Appellant:* Yes, sir.

*Trial court:* Let me ask you an open-ended question, Mr. Dunlap, is there anything else you want to add about your plea or any question about these proceedings that you have before I ask your attorneys for additional input?

*Appellant:* No, sir.

*Trial court:* Are you confused on any point or question that you've given an answer to today?

*Appellant:* No, sir.

▉▉▉▉▉ "In addition to determining that a defendant who seeks to plead guilty ... is competent, a trial court must satisfy itself that the waiver of his constitutional

---

9. As we explained in *Hatfield v. Commonwealth:*

> Kentucky law dictates that "[a] person is guilty of kidnapping when he unlawfully restrains another person and when his intent is ... to accomplish or to advance the commission of a felony; or to inflict bodily injury or to terrorize the victim or another...." KRS 509.040(1)(b)(c). However, in certain qualified instances within KRS 509.050, kidnapping charges will become inapplicable. KRS 509.050 states:
>
> > A person may not be convicted of unlawful imprisonment in the first degree, unlawful imprisonment in the second degree, or kidnapping when his criminal purpose is the commission of an offense defined outside this chapter and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose. The exemption provided by this section is not applicable to a charge of kidnapping that arises from an interference with another's liberty that occurs incidental to the commission of a criminal escape.
>
> 250 S.W.3d 590, 598–99 (Ky.2008). After quoting Drafters' Commentary, we summarized that the policy behind the kidnapping exemption statute was "to alleviate the problem of overzealous prosecution, by tacking on kidnapping charges to certain crimes through a hypertechnical application of the statutory language." *Id.* at 599.

rights is knowing and voluntary." *Godinez*, 509 U.S. at 400, 113 S.Ct. 2680 (*citing Parke v. Raley*, 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992)). *See also Boykin v. Alabama*, 395 U.S. 238, 243–44, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) ("What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence."). "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). This rule has been incorporated into RCr 8.08, which provides in pertinent part: "The court may refuse to accept a plea of guilty or guilty but mentally ill, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge." Additionally, "[d]ue process requires a trial court to make an affirmative showing, on the record, that a guilty plea is voluntary and intelligent before it may be accepted." *Edmonds*, 189 S.W.3d at 565 (*citing Boykin*, 395 U.S. at 241–42, 89 S.Ct. 1709).

■■■ Turning to the question of voluntariness, "[a] guilty plea is involuntary if the defendant lacked full awareness of the direct consequences of the plea or relied on a misrepresentation by the Commonwealth or the trial court." *Id.* at 566 (*citing Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). To begin with, there is no allegation that the Commonwealth or the trial court made any representations to induce Appellant's plea. Indeed, Appellant acknowledged that "the Commonwealth ha[d] made no agreement with [him] in return for a guilty plea." Furthermore, Appellant acknowledged that he had been advised of and understood his Constitutional rights, but nevertheless wanted to waive those rights. Additionally, the trial court read to Appellant each Count with which he was charged and the penalty range for each offense; Appellant acknowledged that he understood the charges and the penalty ranges, as well as the kidnapping exemption.

Appellant knew precisely what he was giving up by pleading guilty (in lieu of GBMI) including his Constitutional rights and any defenses to his charges, and was fully aware of the consequences of such a plea. *See id.* at 566 (*citing Brady*, 397 U.S. at 755, 90 S.Ct. 1463). Accordingly, substantial evidence supports the trial court's conclusion that Appellant's plea was voluntary.

■■■ For the same reasons, Appellant's plea was entered knowingly and intelligently. "A guilty plea is intelligent if a defendant is advised by competent counsel regarding the consequences of entering a guilty plea, including the constitutional rights that are waived thereby, is informed of the nature of the charge against him, and is competent at the time the plea is entered." *Id.* (*citing Brady*, 397 U.S. at 756, 90 S.Ct. 1463; *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709). Appellant indicated that he was advised by counsel and the court of "the consequences of entering a guilty plea, including the constitutional rights that are waived thereby, ... [and] of the nature of the charge[s] against him. . . ." *Id.* (*citing Boykin*, 395 U.S. at 243, 89 S.Ct. 1709). Having already concluded that Appellant was "competent at the time the plea [was] entered," *id.* (*citing Boykin*, 395 U.S. at 243, 89 S.Ct. 1709), we hold that Appellant's plea was knowing, intelligent, and voluntary.

Appellant, however, complains that the trial court did not (1) ask "searching questions" about what defenses he might be giving up, or (2) explain that the jury would be told that he pled guilty· to six capital offenses.[10] He also complains that the court did not adequately explore why he would be willing to enter a plea without knowing whether it would be Guilty or GBMI, and what the consequences of each choice were. All of his complaints with respect to this issue revolve around his own reluctance to discuss his crimes in detail. He appears to, ask this Court to hold that when a defendant (like himself) refuses to discuss the circumstances surrounding his crimes or his thought-process leading to his decision to plead guilty, insufficient grounds exist from which a trial court can find a knowing, intelligent, and voluntary waiver. We decline to do so. Instead, we hold that the trial court's conclusion was based on substantial evidence and it is therefore not clearly erroneous.

### 3. The Trial Court did not Err by Denying Appellant's Request for a Continuance and New Competency Evaluation.

▮ Appellant next argues that the trial court erroneously refused to have him re-evaluated for competency to plead guilty. Specifically, he contends that denying his requests for a continuance, new competency evaluation, and second competency hearing violated his Fourteenth Amendment rights to present a defense and due process of law, and his Eighth Amendment right to rational sentencing. He further argues that the court's ruling deprived his attorneys the opportunity to fulfill their duty to investigate all possible

defenses and mitigating circumstances and bolster evidence to support a GBMI plea. This issue is preserved.

Assuming, without deciding, that the discovery of the AVM could have provided reasonable grounds on which to grant a continuance and order a new competency evaluation, having already determined that the trial court *properly* found him competent to reject the advice of counsel and enter a guilty plea, any error here would be harmless beyond a reasonable doubt. Appellant waived his right to present a defense by virtue of pleading guilty. *See, e.g., Hughes v. Commonwealth,* 875 S.W.2d 99, 100 (Ky.1994) ("The general rule is that pleading guilty unconditionally waives all defenses except that the indictment did not charge an offense.") (citation omitted).

Also, the trial court's ruling on the motion did not "deprive" defense counsel of the opportunity to investigate defenses; rather, Appellant's guilty plea *absolved* defense counsel of their duty to investigate. The trial court was presented with conflicting wishes of counsel and accused. The trial court exercised its discretion, determined that Appellant was competent, and properly heeded to Appellant's wishes. Defense counsel's duty to investigate possible defenses is outweighed by Appellant's right to pacify a guilty conscience and plead guilty. *See Jacobs v. Commonwealth,* 870 S.W.2d 412, (Ky.1994) (holding that a competent defendant's right to control his own defense encompasses the right to reject counsel's wishes to present an insanity defense).

Finally, both Dr. Trivette and Dr. Nicholas testified that the AVM would have been present when they respectively found Appellant competent to stand trial. Ac-

---

**10.** This argument ignores the following exchange during the plea colloquy:

*Trial court:* Do you also understand that statements you make here today are against

your right to self-incriminate; that is, statements you make today may be used in a sentencing phase of a trial against you.
*Appellant:* Yes, sir.

cordingly, a new evaluation to determine Appellant's competency to plead guilty would have been duplicative because, as previously noted, the standards for determining competency to stand trial and competency to plead guilty are identical in this case. Appellant was adjudged competent and is therefore not entitled to relief on these grounds.

### 4. It was not Reversible Error for the Trial Court to ask Appellant to Admit to the Aggravating Circumstances.

 Appellant next argues that his admission to aggravating circumstances during the plea colloquy was illegal.[11] Specifically, he contends that it was erroneous for the trial court to ask him to admit the aggravators simply because he wanted to plead guilty to the charged offenses. He argues that aggravators are not criminal offenses as defined by the legislature, they are not elements of the offense of murder, and they were not charged by the grand jury in an indictment; thus, he alleges, they were not charges to which he could plead guilty. Additionally, he contends that admitting to the facts listed in the aggravators was outside the scope of his intended plea. This issue is unpreserved.[12]

As previously noted, during the plea colloquy the trial court recited to Appellant the aggravating circumstances alleged by the Commonwealth:

> Trial court [T.C.]: Now let me add to those the aggravating factors that the Commonwealth filed by notice that was recorded on January 6, 2009—that the offense of murder was committed upon

each minor while the defendant was engaged in the commission of arson in the first degree, burglary in the first degree, and rape in the first degree. The second aggravating circumstance being that the defendant's acts of killing the aforementioned was intentional and resulted in multiple deaths. And the third aggravator is the offenses of kidnapping perpetrated against the minors and their mother, Kristy Frensley, were committed while the defendant was engaged in the commission of the crimes of arson in the first degree, burglary in the first degree, rape in the first degree, and murder in the first degree. Are you also aware that those are the aggravating factors that make the capital offenses punishable potentially by the death penalty?

> Appellant: Yes, sir.

> Trial court: And is there anything about any of those charges that you don't understand? Or the aggravators for that matter?

> Appellant: No, sir.

> Trial court: And you understand the facts from which those charges arose—in other words, why you got charged with those offenses.

> Appellant: Yes, sir.

> Trial court: Is there anything you don't understand about the facts from which those charges arose?

Later in the colloquy, after Appellant admitted his guilt to each count against him, the following exchange occurred:

> Trial court: And do you acknowledge that the offense of murder was commit-

---

11. Appellant's brief presents this issue within his sub-argument that his waiver was not knowing and voluntary. See Section III.A.2, supra. However, we believe that this argument is sufficiently distinguishable to warrant a separate discussion.

12. Although Appellant's counsel objected generally to Appellant's entry of a GBMI and/or Guilty plea, no further objection was raised when he was asked to admit to the aggravating factors. Thus, this issue was not properly brought to the trial court's attention.

ted upon each minor while you were engaged in the commission of arson in the first degree, burglary in the first degree, and rape in the first degree?

*Appellant:* Yes, sir.

*Trial court:* And do you further admit that your acts of killing the three deceased persons were intentional and did result in multiple deaths?

*Appellant:* Yes, sir.

*Trial court:* And do you further admit that the offenses of kidnapping against the three minors and their mother were committed while you were engaged in the commission of arson in the first degree, burglary in the first degree, rape in the first degree, and murder in the first degree?

*Appellant:* Yes, sir.

*Trial court:* All right. Do you admit your guilt to those offenses and to those aggravators because you are guilty and for no other reason?

*Appellant:* Yes, sir.

Appellant contends that admitting to the aggravating circumstances was outside the scope of his intended plea; he only intended to waive his rights in the guilt phase, and not the sentencing phase; and that he had a constitutional right to have a jury consider the death penalty only after it found the existence of the aggravators beyond a reasonable doubt.

 KRS 532.025(2) provides, in relevant part:

In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence:

. . .

2. The offense of murder or kidnapping was committed while the offender was engaged in the commission of arson in the first degree, robbery in the first degree, burglary in the first degree, rape in the first degree, or · sodomy in the first degree;

. . .

6. The offender's act or acts of killing were intentional and resulted in multiple deaths. . . .

Subsection (3) of that statute provides:

The jury, if its verdict be a recommendation of death, or imprisonment for life without benefit of probation or parole, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. . . . In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.

Thus, Appellant is correct—the jury must find that the statutory aggravators exist beyond a reasonable doubt before a death sentence may be imposed. *See, e.g., Young v. Commonwealth,* 50 S.W.3d 148, 155 (Ky.2001).

We agree with Appellant that it was error for the trial court to ask him to admit to the aggravating factors. KRS 532.025 makes clear that aggravators are to be considered by the finder of fact

during the sentencing phase. KRS 532.025(2) provides that the trial judge "shall include in his instructions to the jury for it to consider, any ... aggravating circumstances otherwise authorized by law and any of the following statutory aggravating ... circumstances which may be supported by the evidence." Subsection (3) provides that at least one statutory aggravator must be established beyond a reasonable doubt before the death penalty may be imposed.

It is equally clear that Appellant only intended to waive his rights in the guilt phase. First, a handwritten addendum to Appellant's Motion to Enter a Guilty Plea provides that he only intended to waive his rights "in the guilt/innocence phase of the scheduled jury trial." A separate clause added to Appellant's motion provides: "In no event am I waiving my right to have a sentence imposed by a jury." Thus, Appellant intended only to plead guilty to the offenses with which he was charged and not to admit to facts that must be established beyond a reasonable doubt during the sentencing phase. Although a criminal defendant may stipulate to aggravating circumstances, *see Furnish v. Commonwealth,* 267 S.W.3d 656, 660 (Ky.2007), we believe any stipulation should occur during the sentencing phase and not during a plea colloquy. Although it was not improper to ask Appellant whether he *understood* the aggravating circumstances alleged by the prosecution, the trial court erred when it asked Appellant to *admit* to the aggravating circumstances during the plea colloquy. They were simply irrelevant to the guilt phase. We therefore turn our attention to whether the error may be deemed harmless.

■ First, we must ask whether there was a reasonable justification for defense counsel's failure to object when the trial court asked Appellant to admit to the ag-

gravating circumstances. *Sanders,* 801 S.W.2d at 668. We answer this question in the negative. This case does not present a scenario in which we could conclude that admitting to aggravating circumstances constitutes sound trial strategy. We can think of no other reason, nor does Appellant offer one, for counsel's failure to object.

■ Because there is no reasonable justification for Appellant's failure to object, we must ask "whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed." *Id.* We cannot conclude that, minus the error, Appellant may have escaped the death penalty.

The aggravating circumstances were part and parcel of crimes to which he had already pled guilty. For example, with respect to the aggravating circumstances applicable to the murder counts: (1) "The offense of Murder was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, or Rape the First Degree" was satisfied by his respective guilty pleas to those three crimes; and (2) "The Defendant's act or acts of killing were intentional and resulted in multiple deaths" was satisfied by his guilty pleas to the three murders. With respect to the aggravating circumstance applicable to the kidnapping counts: "The offense of kidnapping was committed while the Defendant was engaged in Arson in the First Degree, Burglary in the First Degree, Rape the First Degree, or Murder in the First Degree" was satisfied by Appellant's respective guilty pleas to those crimes. Thus, we believe that even if the trial court had not asked Appellant to admit to the aggravating factors, the jury would have easily concluded that these aggravators

were satisfied by Appellant's guilty pleas to the charges underlying them, and still would have imposed the death penalty for each capital conviction.

 Finally, we note that despite Appellant's admissions, the jury was properly instructed that it must find beyond a reasonable doubt that one of the statutory aggravators existed in order to impose an enhanced sentence.[13] "[A] jury is presumed to follow a trial court's instructions...." *Dixon v. Commonwealth,* 263 S.W.3d 583, 593 (Ky.2008) (*citing Matheney v. Commonwealth,* 191 S.W.3d 599, 606 (Ky.2006)). We therefore hold that although the trial court erred by asking Appellant to admit the aggravating circumstances during the plea colloquy, the error was harmless because we cannot conclude that, but for the error, he may have escaped the death penalty.

### B. Playing Appellant's Videotaped Guilty Plea Colloquy for the Jury does not Constitute Reversible Error.

Appellant next argues that the trial court improperly permitted the Commonwealth to introduce the videotaped guilty plea colloquy. Specifically, Appellant argues that it was erroneous to allow the jury to hear (1) a plea where the trial court accepted his admission to three aggravating factors and (2) the trial court's finding that Appellant is not mentally ill under Kentucky law. "[W]e review a trial court's evidentiary rulings for an abuse of discretion." *Penman,* 194 S.W.3d at 245. "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

On the first day of trial, the Commonwealth admitted into evidence the videotape of the guilty plea colloquy. The Commonwealth did not want to play it at that time and the trial court admitted it as a "non-jury exhibit." Later that day, the Commonwealth sought to introduce Appellant's actual videotaped guilty plea and admission to the aggravating circumstances.

At the end of a fairly lengthy discussion on the matter, the trial court denied the Commonwealth's motion to play the videotape *and* stated that it was not going to advise the jury that Appellant had admitted to the aggravators during the plea colloquy. As grounds for the denial, the court noted defense counsel's objection that it was questionable whether Appellant understood that his guilty pleas being played for the jury might also extend to his admission to the aggravating factors. The court also noted that it might confuse the jurors to hear the court "weigh in" on the aggravators. The court added that the Commonwealth's hands were not tied because the existence of the aggravators was established by the fact that Appellant pled guilty to committing the crimes. *See* Section III.A.4, *supra.*

The following day, the Commonwealth renewed its motion to admit the videotape or, in the alternative, to advise the jury that Appellant had admitted to the aggravators during the plea colloquy. Defense counsel renewed their objection, but added that if the tape was going to be played, the *entire* discussion should be played. The trial court took the matter under consideration and later ruled that the Commonwealth could play the tape, beginning with defense counsel's argument that, in his opinion, the plea was not being entered knowingly, voluntarily, and intelligently, and excluding Dr. Nicholas's testimony.

13. This will be discussed in greater detail in Section III.B.1, *infra.*

### 1. The Playing of the Videotaped Plea Colloquy did not Taint the Jury's Findings.

██ Appellant first argues that there is a substantial possibility that the issue of whether the aggravating circumstances existed had already been decided, based on Appellant's admissions to the aggravators during the plea colloquy. KRS 532.025(3) requires the jury to find the existence of aggravating circumstances beyond a reasonable doubt. This issue is preserved.

As previously noted, during the plea colloquy the trial court erroneously asked Appellant to admit, and accepted Appellant's admission, to the aggravating circumstances. This exchange was played for the jury during trial. We conclude that any error in the videotape's admission was cured by instructions that made it abundantly clear that the jury was required to find beyond a reasonable doubt that the aggravators existed.

The first general instruction to the jury, titled "INSTRUCTIONS TO JURY (All Counts)," provided:

> You will now determine whether there are mitigating or aggravating facts and circumstances bearing upon the question of punishment, following which you will fix a sentence for the Defendant for each crime. In considering such evidence as may be unfavorable to the Defendant, you will bear in mind that the law presumes the Defendant to be innocent unless and until you are satisfied from the evidence beyond a reasonable doubt that he is guilty. *You will apply the same presumption in determining whether there are aggravating circumstances bearing on the question of what punishment should be fixed for the Defendant in this case.*

(Emphasis added.)

Moreover, The "AUTHORIZED SENTENCES" instruction provided: "[Y]ou cannot fix his sentence at [an enhanced sentence], unless you are satisfied from the evidence beyond a reasonable doubt that one of the statements listed in [the aggravating circumstances instruction] is true in its entirety, in which event you must state in writing ... that you find the aggravating circumstance or circumstances to be true beyond a reasonable doubt." Furthermore, the "AGGRAVATING CIRCUMSTANCES" instruction provided: "[Y]ou shall consider the following aggravating circumstances which you may believe from the evidence beyond a reasonable doubt to be true...." Also, the "REASONABLE DOUBT" instruction provided: "If you have a reasonable doubt as to the truth or existence of an aggravating circumstance listed in [the "Aggravating Circumstances" instruction], you shall not make a finding with respect to it."

Additionally, the verdict form for the aggravating circumstances read: "We, the jury, find beyond a reasonable doubt that the following aggravating circumstance or circumstances exist in this case...." Reasonable jurors would understand these instructions to mean exactly what they say: the jury must determine the existence of the aggravating circumstances beyond a reasonable doubt. "[A] jury is presumed to follow a trial court's instructions...." *Dixon v. Commonwealth*, 263 S.W.3d 583, 593 (Ky.2008) (*citing Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky.2006)).

██ Finally, even if the instructions had not cured any potential error, the error would nevertheless be harmless beyond a reasonable doubt. As noted, the existence of all three aggravating circumstances was satisfied by virtue of Appellant's guilty pleas. *See* Section III.A.4,

*supra.*[14] In fact, during closing arguments defense counsel *admitted* that the aggravating circumstances had been proven beyond a reasonable doubt.[15] Thus, any uncured error in playing the part of the colloquy in which Appellant admitted to the aggravating factors would be harmless.

### 2. The Playing of the Videotaped Plea Colloquy did not Prevent the Jury from Considering Mental Illness as a Mitigator.

■ Next, Appellant argues that the trial court's finding that Appellant was not mentally ill as a matter of law prevented the jury from considering mental illness as a mitigator. This issue is unpreserved.[16] When discussing its determination concerning Appellant's GBMI plea, the trial court made the following findings on the record:

> *Trial court:* As both counsel had pointed out, the determination of Guilty but Mentally Ill is the accused person's burden under KRS 504.130, and that is to prove "by a preponderance of the evidence that he was mentally ill at the

time of the offense." And both counsel have recited the definition of mental illness under the criminal code, which is "substantially impaired capacity to use self-control, judgment, or discretion in the conduct of one's affairs and social relations," and then some other language.

I do believe that the diagnostic report and from Dr. Nicholas's testimony that Mr. Dunlap does have the lesion and that it is apparently more sizable than Dr. Trivette had seen as told to her by the radiologist on the CT scan. From the testimony that I've heard and the diagnostic reports—Dr. Nicholas I think testified truthfully, but on the key question he was honest enough to say that he could not say that at the time of these crimes that Mr. Dunlap did have a substantially impaired capacity to use self-control, judgment or discretion. He acknowledged that the brain tissue was gone and apparently there's no question about that. The brain abnormality is the difference in blood flow because of the apparent existence of the bundle of veins and arteries at that spot. *But I*

---

14. Specifically, with respect to the murder aggravating circumstances: (1) "The offense of Murder was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, or Rape the First Degree" was satisfied by his respective guilty pleas to those three crimes; and (2) "The Defendant's act or acts of killing were intentional and resulted in multiple deaths" was satisfied by his guilty plea to the three murders.

With respect to the kidnapping aggravating circumstance: "The offense of kidnapping was committed while the Defendant was engaged in Arson in the First Degree, Burglary in the First Degree, Rape the First Degree, or Murder in the First Degree" was satisfied by Appellant's respective guilty pleas to those crimes.

15. Specifically, defense counsel stated:
The first thing you will probably need to decide is whether aggravating circum-

stances have been proven beyond a reasonable doubt. The judge instructed you on those. And, let's make it real easy: they have been. You don't have to spend a lot of time thinking about whether the aggravating circumstances have been proven. They have.

16. Although Appellant objected to playing the recording of the plea colloquy, he only expressed concern with the admission to the aggravating circumstances and Dr. Nicholas's testimony in support of a GBMI plea. At no point in the discussions did counsel ever raise the issue presented here, *i.e.*, that the jury should not hear the trial court's finding that Appellant was not mentally ill for purposes of his GBMI plea because it would prevent it from considering mental illness as a mitigator. Because it was not raised to the trial court, we deem it unpreserved.

*simply don't believe by a preponderance of the evidence that Mr. Dunlap was mentally ill at the time of the commission of these offenses.*

. . . .

[Addressing Appellant]: It's clear to me and I find that your pleas to these offenses have been made knowingly, intelligently, and voluntarily today. Just as you're competent to stand trial, you're also competent to reject the advice of your capable and competent counsel and go ahead and enter a plea as is your right.

And I do find that you do have the capacity to appreciate what we've been about here this morning, and that you have made a rational choice before today and including today with respect to the entry of your guilty pleas and the rejection of your attorney's advice to not enter those pleas. *And as I just mentioned I don't believe that you suffer from a mental illness as defined by statute.*

(Emphasis added.) Appellant contends that the trial court's finding that he was not mentally ill as a matter of law prevented the jury from considering mental illness as a mitigator. We disagree.

First, the jury instructions specifically provided that the jury was free to consider mental illness as a mitigator:

In fixing a sentence for the Defendant ... you shall consider such mitigating and extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true:

. . . .

B. At the time of the offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of

law was impaired as a result of mental illness, even though the impairment of the capacity of the Defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law was insufficient to constitute a defense to the crime.

"It is a longstanding principle that a jury is presumed to follow a trial court's instructions...." *Dixon*, 263 S.W.3d at 593(*citing Matheney*, 191 S.W.3d at 606). We have been given no reason to believe that this presumption is defeated in this case.

■■■■ Second, to remove all doubt, the trial court admonished the jury not to be concerned, or even to factor in, any rulings that I have made during the course of this sentencing trial.... Likewise, you saw the guilty plea entry from earlier in the month ... and you heard some of my findings that are required in accepting or not accepting a guilty plea and I want you to disregard what I said in that, too, because what I say is different and does not interfere with the duty that you have as jurors to make your own findings in this case in regard to an appropriate penalty.

"A jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (*citing Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky.1999), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010)).

There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defen-

dant, *Alexander [v. Commonwealth*, 862 S.W.2d 856,] 859 [ (Ky.1993) ]; or (2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Id.* (*citing Derossett v. Commonwealth*, 867 S.W.2d 195, 198 (Ky.1993), and *Bowler v. Commonwealth*, 558 S.W.2d 169, 171 (Ky.1977)). The second exception is inapplicable. With respect to the first exception, we do not believe there is an overwhelming probability that the jury was unable to follow the court's admonition. We therefore hold that the playing of the plea colloquy for the jury did not taint their determination that the aggravating circumstances existed beyond a reasonable doubt, and did not prevent them from considering mental illness as a mitigator.

## C. The Trial Court Properly Denied Appellant's Guilty but Mentally Ill Plea.

Appellant next argues that the trial court's finding that he was not mentally ill and its subsequent rejection of his GBMI plea violated his due process right to a fair trial and his Eighth Amendment right to fair sentencing. He alleges that the GBMI statute, KRS 504.130, violates the separation of powers doctrine found in Sections 27 and 28 of the Kentucky Constitution because it imposes an additional element, *i.e.*, the specific preponderance of the evidence burden of proof on the defendant, not found in RCr 8.08. In the alternative, he contends that he proved his mental illness by a preponderance of the evidence and the trial court therefore had no discretion to reject his GBMI plea.

## 1. Separation of Powers.

 First, Appellant argues that KRS 504.130 is unconstitutional as a violation of separation of powers because it imposes a preponderance of the evidence burden of proof upon a defendant pleading GBMI. He contends that defining and assigning burdens of proof in criminal cases belongs to the judicial branch, and therefore KRS 504.130 intrudes on the province of the Judiciary. This issue is unpreserved.

RCr 8.08 authorizes a trial court to accept a GBMI plea.[17] KRS 504.120(4) provides: "In cases in which the defendant provides evidence at trial of his mental illness or insanity at the time of the offense, the jury or court may find the defendant ... [g]uilty but mentally ill at the time of the offense." Finally, KRS 504.130 provides the grounds for finding a defendant GBMI:

(1) The defendant may be found guilty but mentally ill if:

 (a) The prosecution proves beyond a reasonable doubt that the defendant is guilty of an offense; and

 (b) The defendant proves by a preponderance of the evidence that he was mentally ill at the time of the offense

(2) If the defendant waives his right to trial, the court may accept a plea of guilty but mentally ill if it finds that the defendant was mentally ill at the time of the offense.

Appellant contends that KRS 504.130's imposition of the specific preponderance burden on the defendant violates the separa-

---

**17.** RCr 8.08 provides:

A defendant may plead not guilty, guilty or guilty but mentally ill. The court may refuse to accept a plea of guilty or guilty but mentally ill, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or guilty but mentally ill or if a defendant corporation fails to appear, the court shall enter a plea of not guilty.

tion of powers doctrine because it "skews the procedure mandated in RCr 8.08" that the trial court determine that the GBMI plea was simply "made voluntarily with understanding of the nature of the charge."

We addressed another challenge to the constitutionality of the GBMI statute in *Star v. Commonwealth*, 313 S.W.3d 30, 37 (Ky.2010). Although the separation of powers argument was not made in that case, *Star* provides a good starting point for our analysis because we noted the strong presumption in favor of a statute's constitutionality its challenger is required to overcome:

> The constitutionality of guilty but mentally ill verdicts has been an issue courts across this country have faced. "To date no case has been found in which an appellate court has held a guilty but mentally ill statute to be unconstitutional." Debra T. Landis, J.D., *"Guilty But Mentally Ill" Statutes: Validity and Construction*, 71 A.L.R.4th 702, 707 (1989). It has long been held that a statute enacted by the General Assembly carries a strong presumption of constitutionality. *Martinez v. Commonwealth*, 72 S.W.3d 581, 584 (Ky.2002). A statute will not be invalidated as unconstitutional unless it clearly, unequivocally, and completely violates provisions of the Constitution. *Cornelison v. Commonwealth*, 52 S.W.3d 570, 572 (Ky. 2001). Further, the party questioning the constitutionality of a statute bears the burden of proving its contention. *Id.* at 572–73.

*Id.*, Appellant has not made the requisite showing of unconstitutionality.

Section 116 of the Kentucky Constitution provides that "The Supreme Court shall have the power to prescribe ... rules of practice and procedure for the Court of Justice." Whether burdens of proof are matters of "practice and procedure" or are better characterized as "substantive" law is not always clear. Appellant argues that burdens of proof are a matter of evidence which is procedural and under our exclusive control. However, he cites only one case in support of his argument, *Veltrop v. Commonwealth*, 269 S.W.3d 15, 17 (Ky. App.2008). In *Veltrop*, the Court of Appeals was presented with whether the Driving Under the Influence statute is unconstitutional as a violation of separation of powers. *Id.* The court noted that "[w]hether evidence is relevant to the facts of a case is within the exclusive confines of the 'practice and procedure' of the judicial branch of government," *id.* (*citing O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 576 (Ky.1995)), but it ultimately held that the appellant did not have standing to challenge the constitutionality of the statute, *id.* Thus, *Veltrop* has little value here.

We do not think the issue is as simple as characterizing burdens of proof as matters of evidence. The Superior Court of Pennsylvania dealt with an almost identical issue in *Pennsylvania v. Sargent*, 349 Pa.Super. 289, 503 A.2d 3 (1986). In *Sargent*, the appellant challenged the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons.Stat. § 9713, as a violation of separation of powers. 503 A.2d at 4. Specifically, he alleged that Section "9713(c), which dictates the burden of proof to be employed at sentencing, violates Article V, § 10(c) of the Pennsylvania Constitution, which gives the judiciary exclusive control over matters of practice and procedure in the courts[.]" *Id.*

*Sargent* illustrates precisely why the issue is more complicated than just labeling a burden of proof as a "matter of evidence" and therefore within the exclusive province of the Judiciary:

A statute establishing a burden of proof is difficult to classify as either a procedural rule or a rule affecting substantive rights and seems to contain elements of each. *Cf. Commonwealth v. Sorrell*, 500 Pa. 355, 364, 456 A.2d 1326, 1331 (1982) (NIX, J., dissenting) (right to trial by jury neither purely procedural nor substantive but falls within gray area between substance and procedure). The thrust of appellant's argument is that because § 9713(c) establishes the burden of proof to be utilized at sentencing, it dictates to the courts how to conduct a sentencing hearing and it is thus a matter of practice or procedure. (Brief for Appellant at 20–21). The burden of proof standard, however, may also be characterized as a substantive rule of law affecting substantive rights. For instance, for purposes of determining whether state or federal law applies in diversity cases, there is a long line of cases referring to the burden of proof as substantive. *See, e.g., Dick v. New York Life Insurance Co.*, 359 U.S. 437, 446, 79 S.Ct. 921, 927, 3 L.Ed.2d 935 (1959); *Coastal Plains Feeders, Inc. v. Hartford Fire Insurance Co.*, 545 F.2d 448, 450–51 n. 5 (5th Cir.1977); *Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1174–75 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *Boone v. Royal Indemnity Co.*, 460 F.2d 26, 29 (10th Cir. 1972). *See generally*, 1A Pt. 2 *Moore's Federal Practice* ¶ 0.314[2] (2d ed. 1985) (burden of proof is substantive within the meaning of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) case). In addition, Pennsylvania courts have referred to the burden of proof as substantive or affecting substantive rights in several cases. *See Stratford v. Boland*, 306 Pa.Superior 475, 478 n. 1, 452 A.2d 824, 825 n. 1 (1982) (resort to common law procedure

does not change *substantive* burden of proof borne by a plaintiff); *Miller v. Hild*, 303 Pa.Superior 332, 335 n. 2, 449 A.2d 714, 716 n. 2 (1982) (amended procedural rule altered burden of proof and therefore affected substantive rights); *Ryan v. MacDonald*, 151 Pa.Superior 607, 609, 30 A.2d 662, 663 (1943) (burden of proof that shifted to the plaintiff is not governed by a procedural rule, but is a substantive rule of law). Of course these cases are not conclusive in the determination whether § 9713(c) is a rule of substance or procedure for purposes of determining the bounds of a court's rulemaking authority and consequential limits of the legislature's power because, "[t]he line between 'substance' and 'procedure' shifts as the legal context changes," *Hanna v. Plummer [Plumer]*, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965).

*Id.* at 294–96, 503 A.2d 3 (footnotes omitted). The court ultimately held that the statute was not unconstitutional because the "appellant ha[d] not sustained his burden of affirmatively establishing that § 9713(c) is a statute governing procedure in the courts and hence beyond the authority of the Legislature to enact." *Id.* at 296, 503 A.2d 3.

Likewise, here, Appellant has not sustained his burden of affirmatively establishing that KRS 504.130 is a statute governing procedure in the courts and therefore beyond the authority of the General Assembly to enact. As in Pennsylvania, courts in Kentucky have variously described burdens of proof as procedural or substantive. *See, e.g., Rodgers v. Commonwealth*, 285 S.W.3d 740, 751 (Ky.2009) (discussing changes in self-defense statute: "[T]he new amendments alter the circumstances constituting self-defense and create certain presumptions which will alter the burden of proof in

self-defense cases. Those are amendments to the substantive law."); *Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368, 388 (Ky.2000) (Graves, J., dissenting) (describing "beyond a reasonable doubt" burden of proof as a "criminal procedural protection"); *Commonwealth Dept. of Agric. v. Vinson,* 30 S.W.3d 162, 169 (Ky. 2000) (discussing retroactivity of amendments to the Whistleblower Act: "The change in the burden of proof was ... a change in substantive law."); *Gall v. Commonwealth,* 607 S.W.2d 97, 108 (Ky. 1980) (referring to burden of proof as a "procedural aspect[ ]" of manslaughter statute), *overruled on other grounds by Payne v. Commonwealth,* 623 S.W.2d 867 (Ky.1981); *Stephenson v. CSX Transp., Inc.,* No. 2002–CA–001796–MR, 2003 WL 22113458, at *2 (Ky.App.2003) (noting that with respect to conflicts of law issues "[c]ourts have recognized rules involving burden of proof, sufficiency of the evidence, and the measure of damages as being 'substantive' and governed by federal law"). Accordingly, we hold that Appellant has not sustained his burden of establishing that KRS 504.130 "clearly, unequivocally, and completely violates provisions of the Constitution." *Cornelison,* 52 S.W.3d at 572.

We pause here to note that even if we were to deem KRS 504.130(*l* )(b)'s preponderance of the evidence standard as an unconstitutional encroachment on the Judiciary's rule-making authority, it would not necessarily render the statute void. In *Ex parte Auditor of Public Accounts,* this Court struck down legislative enactments "authorizing the Supreme Court to appoint a board of bar examiners and to organize and govern the bar, and again requiring that admission fees be remitted to the state treasury." 609 S.W.2d 682, 684 (Ky. 1980). Those statutes were enacted in 1976, shortly after Section 116 of the Kentucky Constitution became effective. *See*

*id.* We held that those statutes were inconsistent with Section 116 and therefore "void because they purport to erect powers and limitations that no longer fall within the legislative province," *i.e.,* a separation of powers violation. *Id.* However, we acknowledged that there is a "gray area in which a line between the legislative prerogatives of the General Assembly and the rule-making authority of the courts is not easy to draw." *Id.* at 688. "The policy of this court is not to contest the propriety of legislation in this area to which we can accede through a wholesome comity." *Id.*

Similarly, in *Ex parte Farley,* this Court opined:

It is not our disposition to be jealous or hypertechnical over the boundaries that separate our domain from that of the legislature. Where statutes do not interfere or threaten to interfere with the orderly administration of justice, what boots it to quibble over which branch of government has rightful authority? We respect the legislative branch, and in the name of comity and common sense are glad to accept without cavil the application of its statutes pertaining to judicial matters, just as we accept KRS 532.075, even though it has been argued with much force that there is no constitutional basis for a statute enlarging the scope of appellate review beyond the matters of record in the proceeding under consideration.

570 S.W.2d 617, 624–25 (Ky.1978). Thus, where the General Assembly has enacted legislation that technically violates the separation of powers doctrine but is not inconsistent with a rule promulgated by this Court under its rulemaking authority, we have upheld the statute.

For example, in *O'Bryan v. Commonwealth,* we held a change of venue statute unconstitutional as a violation of separa-

tion of powers, but added: "Until this statute is superseded by this Court, under the Court's paramount rule-making authority, it stands as enacted by the General Assembly under the principles of comity elucidated in *Ex Parte Auditor of Public Accounts,* Ky., 609 S.W.2d 682 (1980)." 634 S.W.2d 153, 158 (Ky.1982). And in *Commonwealth v. Reneer,* we held that although the Truth in Sentencing statute "constitutes an encroachment by the General Assembly upon the prerogatives of the Judiciary, it is, nevertheless, not an unreasonable encroachment" under the comity doctrine. 734 S.W.2d 794, 797 (Ky.1987). Accordingly, even if we were to deem KRS 504.130 to be procedural, we could uphold its validity under the principles of comity if it did not pose an "unreasonable interference with the orderly functioning of the courts." *Id.* That, however, is an issue for another day.

## 2. *The Trial Court's Finding that Appellant was not Mentally Ill is not Clearly Erroneous.*

We now turn to whether the trial court properly rejected the GBMI plea. We have not previously established the standard by which an appellate court reviews a trial court's ruling on a GBMI plea. Citing us to *Chapman,* 265 S.W.3d at 177, the Commonwealth argues that we should review for abuse of discretion, although it acknowledges that *Chapman* dealt with our review of a plea agreement and not, as here, an unconditional plea.

Appellant, on the other hand, argues that the trial court has no discretion when the requisite showing of mental illness is made. He asserts that where proof exists to support a finding of GBMI, "it is a violation of the due process clause of the Fourteenth Amendment and, in a capital case, the [Eighth] Amendment, as well as Section 1, 2, and 17 of the Kentucky Con-

stitution for a court to then arbitrarily reject the GBMI portion of the plea when the plea would otherwise have been accepted by the court." In this light, Appellant appears to ask us to review the trial court's ruling *de novo.*

Facially, both RCr 8.08 and KRS 504.130 grant the trial court discretion to deny a GBMI plea. RCr 8.08 explicitly authorizes the trial court to reject the plea, providing in relevant part: "A defendant may plead not guilty, guilty or guilty but mentally ill. *The court may refuse to accept a plea of guilty or guilty but mentally ill,* and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge." (Emphasis added.) KRS 504.130 is less explicit, but uses the same permissive language:

> (1) The defendant *may* be found guilty but mentally ill if:
>
> > (a) The prosecution proves beyond a reasonable doubt that the defendant is guilty of an offense; and
> >
> > (b) The defendant proves by a preponderance of the evidence that he was mentally ill at the time of the offense.
>
> (2) If the defendant waives his right to trial, the court *may* accept a plea of guilty but mentally ill if it finds that the defendant was mentally ill at the time of the offense.

(Emphasis added.) Thus, the rule and the statute vest a certain amount of discretion in the trial court.

However, the discretion built into RCr 8.08 and KRS 504.130 appears to derive from the fact that so many cases are resolved by plea agreements wherein the defendant agrees to plead guilty, usually in exchange for some benefit promised by the Commonwealth. RCr 8.08 and KRS 504.130 preserve the trial court's right to reject the plea agreement if, for example,

it believes it to be unfair. For example, in *Hoskins v. Maricle*, the co-defendants were originally charged with two counts of intentional murder, making them eligible for the death penalty. 150 S.W.3d 1, 25 (Ky.2004). Pursuant to a plea agreement, they ultimately pled guilty to one Class C felony carrying a maximum sentence of ten years' imprisonment. *Id.* The trial court rejected the plea agreement as too lenient and we concluded that was not an abuse of discretion, noting: "That is exactly the discretionary role that RCr 8.08 contemplates for trial courts." *Id.*

It is a different story entirely, however, when a defendant makes an unconditional GBMI plea. If he does *not* carry his KRS 504.130 burden of proving by a preponderance of the evidence that he was mentally ill at the time of the offense, the trial court clearly has no discretion to accept the GBMI plea; it *must* reject it because there is an insufficient factual basis to support a finding of mental illness. *See* KRS 504.130. That is precisely what happened in this case, and it illustrates why the abuse of discretion standard is not the appropriate standard of appellate review for *all* pleas under RCr 8.08 and KRS 504.130. On the other hand, de novo review is improper because "the trial court is required by statute to make findings of fact with respect to the defendant's mental illness before accepting such a [GBMI] plea." *Commonwealth v. Ryan*, 5 S.W.3d 113, 115 (Ky.1999), *abrogated on other grounds by Hoskins*, 150 S.W.3d 1. We are not a fact-finding Court.

 Instead, we hold that when a trial court rejects a GBMI plea on the basis that the defendant did not carry his burden of proving, by a preponderance of the evidence, that he was mentally ill at the time of the offense, an appellate court may review that determination, if properly preserved, for clear error. CR 52.01. Un-

der the "clearly erroneous" standard, the trial court's ruling will not be disturbed if it is supported by substantial evidence. *See Keeling v. Commonwealth*, 381 S.W.3d 248, 262 (Ky.2012) (applying clearly erroneous standard to trial court's competency determination). In *Commonwealth v. Harrelson*, we applied the "clearly erroneous" standard to a district court's ruling on a motion to dismiss. 14 S.W.3d 541, 548 (Ky.2000). We explained the wisdom in applying that standard:

> One of the major reasons for CR 52.01 is to have the record show the basis of the decision of the trial court so that on appellate review, the appellate court may understand more completely the entire controversy. *Reichle v. Reichle*, Ky., 719 S.W.2d 442 (1986). The reviewing court may test the accuracy of the findings and conclusions and determine whether they are sufficiently comprehensive and pertinent to the issues so as to provide a basis for a decision. The clearly erroneous standard is sufficiently broad to permit a reviewing court to adopt a method of review which best fits the questions involved and the particular facts in a specific case. The appellate court should review each case according to what is most appropriate under the specific circumstances.
>
> Although due deference is given to the findings of the trial court, the evidence may be examined and the judgment may be reversed when the reviewing court is convinced that the trial judge has committed error. *Ken–Tex Exploration Co. v. Conner*, Ky., 251 S.W.2d 280 (1952). Mere doubt as to the correctness of a finding would not justify reversal, and the appellate court does not consider and weigh evidence de novo. However, if a finding is without adequate evidentiary support or occasioned by an erroneous application of

the law, the reviewing court may regard it as clearly erroneous. *Cf. Byerly Motors, Inc. v. Phillips Petroleum,* Ky., 346 S.W.2d 762, 765 (1961).

A reviewing court is always reluctant to disturb the findings of a trial court. *See Allen v. Arnett,* Ky., 525 S.W.2d 748 (1975). When the trial court makes findings of fact, a reviewing court will not disturb such findings unless clearly erroneous. However, if the trial court predicates its findings on erroneous construction and application of statutes, the clearly erroneous standard does not apply. *Commonwealth v. Kentucky Products, Inc.,* Ky., 616 S.W.2d 496 (1981). *Id.* at 548–49. The same logic applies to review of a trial court's rejection of a GBMI plea.

█ Applying this standard here, we conclude that the trial court's determination that Appellant was not mentally ill at the time of the offenses is supported by substantial evidence and is therefore not clearly erroneous. KRS 504.060(6) defines *mental illness* as "substantially impaired capacity to use self-control, judgment, or discretion in the conduct of one's affairs and social relations, associated with maladaptive behavior or recognized emotional symptoms where impaired capacity, maladaptive behavior, or emotional symptoms can be related to physiological, psychological, or social factors." Both Dr. Nicholas and Dr. Trivette diagnosed Appellant with an Axis I depressive disorder not otherwise specified. However, Appellant's primary contention, once again, is that the AVM in his brain rendered him mentally ill at the time of the offense.

Prior to the AVM's official diagnosis, Dr. Trivette noted that a CT scan revealed that Appellant had "two non-specific punctuate hyper-attenuated foci" in his right frontal lobe. She concluded, however, that these foci did not affect Appellant's competency or criminal responsibility. Dr. Trivette stated that the foci might be an AVM, which should be followed-up on but was not an urgent issue. She testified that an AVM seems to occur during development of the fetus or soon after birth and that most people who have an AVM are unaware and have no symptoms. She also stated that the AVM would only affect competency or criminal responsibility if it ruptured and bled. It is undisputed that there was no bleeding associated with Appellant's AVM.

On cross-examination, Dr. Trivette stated that the finding from the radiology report concerning the foci had "no clinical significance." She testified that Appellant's neurological examination was normal, and noted that none of his psychological testing indicated any problems in the frontal lobe. In fact, some of the tests that assess frontal lobe function were areas that Appellant "performed relatively better on." Importantly, Dr. Trivette stated that Appellant had "no problems with impulse control or other things that might suggest problems" in the right frontal lobe while he was at KCPC. Although Dr. Trivette's report and testimony were rendered shortly before the AVM was officially discovered, it is undisputed that Appellant had the AVM when Dr. Trivette evaluated him.

Dr. Nicholas testified that he was virtually certain that Appellant had had this AVM from birth. It is undisputed, and the trial court found as a matter of fact, that despite the AVM, Appellant led a relatively normal and crime-free life prior to the murders. He was thirty-six years old and had recently been honorably discharged from the U.S. Army's elite 160th Special Operations Aviation Regiment, known as the "Night Stalkers," where he served as a helicopter mechanic. He was married with three children and had a full-time job.

There is no evidence that Appellant *ever* had an issue with impulsivity or judgment. Moreover, Dr. Nicholas testified that Appellant did not have a thought disorder and was not psychotic.

Appellant wanted the trial court to believe that the AVM, present since birth, only manifested as a mental illness one time in his life—the day he committed the crimes.[18] The trial court was unpersuaded and determined that Appellant was not mentally ill at the time of the offense; its determination is supported by substantial evidence, and it is therefore not clearly erroneous.

### D. The Jury was Properly Selected.

Appellant next argues that several errors occurred during the jury selection phase of his sentencing trial. Specifically, he alleges that the trial court abused its discretion when it (1) denied four of defense counsel's challenges for cause, (2) excused four qualified jurors for cause, (3) permitted a husband and wife to serve on the jury together, and (4) placed limits on individual voir dire. These issues are preserved.

 As this Court noted in *Brown:* Jury selection in criminal cases in Kentucky is governed by RCr 9.30 through RCr 9.40 and Part Two of the Administrative Procedures of the Court of Justice. Under these provisions the trial court is vested with broad discretion to oversee the entire process, from summoning the venire to choosing the petit jury which actually hears and decides the case. *Fields v. Commonwealth,* 274 S.W.3d 375 (Ky.2008); *Soto v. Commonwealth,* 139 S.W.3d 827 (Ky.2004). Our review of the rulings [Appellant] chal-

lenges is thus limited to determining whether the trial court abused that discretion, that is, whether the ruling can be characterized as arbitrary, unreasonable, or contrary to sound legal principles. *Commonwealth v. English,* 993 S.W.2d 941 (Ky.1999).

313 S.W.3d at 596. Because none of the alleged errors amount to an abuse of the trial court's discretion, Appellant is not entitled to relief on these grounds.

### 1. Unexcused Jurors: Trial Court's Denial of Appellant's Challenges for Cause.

First, Appellant complains that the trial court improperly denied his request to remove four jurors from the venire for cause. He contends that these jurors could not fairly consider the full range of sentences for which he was eligible.

### a. Facts.

### i. Juror R.O.

R.O. stated initially that he would be able to follow the court's instructions and consider the entire range of penalties. Later, however, he testified that he would require the defense to put on some sort of mitigation evidence in order for him to consider a penalty of less-than-death. Later, the Commonwealth asked: "If the court says that you cannot draw any adverse inferences [from the defense not presenting mitigation evidence], could you follow that?" R.O. replied "Yes."

Defense counsel followed up:

*Counsel:* You understand that it's okay to say "no, I couldn't follow that instruction."

*R.O.:* I understand.

---

18. He also alleges that the AVM could potentially explain other issues, but the only one he cites is his history of headaches.

*Counsel:* So you're saying that you would be able to [not require mitigating evidence] not just because the judge instructed you to but because you understand and you feel that way?

*R.O.:* Yes, sir.

Defense counsel then moved to strike R.O. for cause on the basis that his answers indicated he could not consider the full range of penalties. The trial court noted that in the context of R.O.'s other answers, it was clear that he would be able to follow the law and make his views conform to the law. Accordingly, the trial court denied the motion to strike R.O. for cause.

Appellant ultimately used a peremptory challenge to remove R.O. from the venire.

### ii. Juror J.F.

J.F. testified initially that he could "definitely" consider and impose the full range of penalties. He then testified that in cases of intentional murder, the death penalty is the only penalty that should be imposed. Thereafter, he indicated that he had formed the opinion that the death penalty should be imposed in this case. However, J.F. then stated that he would be able to consider and impose the other penalties outlined by the trial court. When asked to clarify, J.F. answered that if the jury agreed on a different penalty, he'd "go along with it." Defense counsel asked, "And your opinion right now is that he should get the death penalty?" J.F. answered "yes," but he was willing to listen to the other eleven jurors. Finally, J.F. testified that he would be able to consider and impose the full range of penalties, even if Appellant did not present mitigation evidence, if the trial court instructed him that he could not draw an adverse inference from Appellant's silence.

Appellant moved to strike J.F. for cause. The Commonwealth replied that J.F. had been completely honest from the beginning, stating that he had formed an opinion but that he would be open to considering and imposing the full range of penalties. The trial court denied the motion to strike for cause, quoting from the bench this Court's decision in *Mabe*, 884 S.W.2d at 671: "Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment."

Appellant ultimately used a peremptory challenge to exclude J.F. from the venire.

### iii. Juror L.H.

In response to the trial court's preliminary questions, L.H. indicated that she could consider the full range of penalties and impose a penalty within that range. She also indicated that she could consider mitigating evidence if so instructed. She admitted further that she had thought about the proper penalty and that the only way she would consider the lower end of the penalty range is if Appellant presented mitigating evidence. However, she later conceded that she would be able to follow a "no adverse inference" instruction. She asserted that even if Appellant did not present mitigating evidence that it was "possible, based on the evidence," that she could consider and impose a twenty-year sentence.

Defense counsel moved to strike for cause because she could not consider a lower-range penalty absent mitigating evidence presented by the defense. The trial court denied the motion. It recognized that L.H. was "honest in saying at first blush something on the low end would not be appropriate based upon what we know about his admission," but she "established that she can conform her opinions to follow the law."

#### iv. Juror V.D.

In response to the trial court's preliminary questions, V.D. indicated that she could consider the full range of penalties. She also stated that she would be able to consider mitigating evidence if so instructed. When asked if she had already excluded any of the penalties within the penalty range, she conceded that under the circumstances as she understood them, she did not think parole should be an option. She then admitted that she might exclude the "term of years" sentence, *i.e.*, twenty to fifty years' imprisonment. However, she then stated that if the judge instructed her to consider the term of years sentence, and the evidence warranted a sentence of twenty to fifty years' imprisonment, she could impose a sentence in that range.

Defense counsel followed up on V.D.'s answer about excluding the lower range of penalties: "As you sit there, do you really think you could fairly consider and impose, if you felt the evidence warranted it, a punishment from that lower range, including a punishment that might make him eligible for parole?" V.D. answered: "As I sit here today, I can't honestly say that; but I haven't seen any evidence, I haven't seen anything." When asked again, she admitted, "That would be hard for me."

The trial court followed up on this line of questioning and the following exchange occurred:

*Trial court:* Understandably, from the crimes that have been announced that he has pled guilty to, they're all serious. And, understandably, a person who's going to be a juror wouldn't necessarily be looking at a minimum penalty. But my question to you is—and I don't want to suggest your answer one way or the other—after you've heard the evidence of the crimes and heard any mitigating evidence the defense may bring forward, if you thought lower-end penalties were

appropriate based on that evidence would you be able to consider the full-range without excluding any?

*V.D.:* Based on the evidence [nods affirmatively].

*Trial court:* And is the reason or is one reason that you said it would be difficult because as you sit there now you have not heard any evidence of how the crimes were committed or mitigation.

*V.D.:* [Nods affirmatively].

Defense counsel moved to strike V.D. for cause on the basis that she could not consider a penalty that includes the possibility of parole or imprisonment for a term of years. The trial court denied the motion, noting that it appeared V.D. would not automatically exclude the lower range of penalties if presented with evidence warranting one of those penalties.

#### b. *Analysis.*

Appellant argues that the trial court abused its discretion when it overruled defense counsel's challenges for cause to these four jurors. He argues that he was forced to use peremptory challenges on R.O. and J.F., and if he had not been so forced he would have used those challenges on L.H. and S.B., two of the twelve jurors that ultimately sentenced him to death. We review for abuse of discretion. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007) (*citing Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky.2003); *Pendleton v. Commonwealth*, 83 S.W.3d 522 (Ky. 2002)).

We succinctly stated the applicable law in *Meece v. Commonwealth:*

A defendant is guaranteed the right to a fair and impartial jury. U.S. Const. amend. 6, 14; Ky. Const. §§ 2, 7, 11; RCr 9.36(1). To ensure this right, the defendant may challenge a juror for cause "[w]hen there is reasonable

ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence...." RCr 9.36. Where the court fails to uphold these rights of a defendant, resulting in his or her use of a peremptory strike to remove such jurors from the panel, such failure is error under *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007).

348 S.W.3d 627, 711 (Ky.2011). However, "[a] per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination." *Mabe*, 884 S.W.2d at 671. "The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Id.* Additionally,

> jurors are not experienced or knowledgeable in the law, nor are they expected to be. Their function is one of fact finding, guided under the auspices of the court's instructions as to the law. Aside from any determinations of bias, a critical analysis is whether a juror will follow the instructions on the law as given by the court and can give serious, meaningful, and fair consideration to the full range of penalties.

*Meece*, 348 S.W.3d at 710 (*citing Springer v. Commonwealth*, 998 S.W.2d 439, 456 (Ky.1999)).

In *Hodge v. Commonwealth*, we noted that the juror in question

> acknowledged that he would consider the full range of penalties, but balked at the prospect of imposing the minimum sentence of twenty years as punishment for committing two intentional murders. Nevertheless, he stated that he would not automatically exclude consideration of the minimum penalty and would consider the full range of penalties. While a juror is disqualified if he or she cannot consider the minimum penalty, *Grooms*

*v. Commonwealth*, Ky., 756 S.W.2d 131 (1988), excusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties. *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175 (1993), *cert. denied*, 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994).

17 S.W.3d 824, 837 (Ky.2000). Applying this same logic here, we cannot conclude that the trial court abused its discretion.

■ Although R.O. stated a preference for the death penalty in the absence of any mitigating evidence, he acknowledged that he could follow the trial court's "no adverse inference" instruction and consider the full range of penalties. Similarly, although L.H. initially indicated that she would have some trouble considering a penalty at the lower end of the penalty range, she ultimately indicated that it was possible that she could impose a twenty-year sentence if the evidence warranted it. Finally, V.D. admitted that it "would be hard for" her to consider a penalty at the lower end of the penalty range, but agreed that her reluctance was based on not having "heard any evidence of how the crimes were committed or mitigation."

Simply put, despite their preference for more severe penalties, these three jurors indicated that they could conform their opinions to follow the law as instructed by the trial court. As we noted in *Hodge*,

> Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... A per se

disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination.

17 S.W.3d at 837 (*quoting Mabe,* 884 S.W.2d at 671). *See also Meece,* 348 S.W.3d at 704–12. We must remember that these three veniremembers were subject to voir dire examination armed only with the knowledge that the man sitting at the defense table had pled guilty to murdering three children in horrific fashion. Their initial reluctance to consider the lower range of penalties is not unreasonable. However, each of them indicated that "after [hearing] all of the evidence, [they could] conform [their] views to the requirements of the law and render a fair and impartial verdict." *Mabe,* 884 S.W.2d at 671. The trial court therefore did not abuse its discretion by denying Appellant's motions to excuse these three jurors for cause.

■■■■ J.F., however, should have been excused for cause. While all potential jurors bring preconceptions about crime and punishment to the jury-selection process, few state that they have definitively made up their minds about the case for which their suitability as a juror is being examined. J.F. did precisely that by stating that he had formed a steadfast opinion that Appellant should receive the death penalty; no amount of rehabilitation could undo this disqualifying answer.

■■■■ However, this error is not grounds for reversal because the trial judge wisely accorded the defense eleven peremptory strikes—two more than required under RCr 9.40—whereas the Commonwealth only received the nine strikes required by the Rule. Appellant was able to remove J.F. with one of those extra strikes and did so. The trial court's wise decision to accord extra peremptory strikes to Appellant assured that one, or even two, errors in "for cause" determinations would not unfairly impact Appellant's "substantial rights" in the jury selection process by essentially giving him fewer peremptory strikes than the Commonwealth. *Shane v. Commonwealth,* 243 S.W.3d 336, 340–41 (Ky.2008).

Our holding in *Shane,* that a defendant has a substantial right in the use of his peremptory challenges to create the jury as he wishes—not to correct for mistakes of the trial court—is inapplicable here because when the trial court provides the defendant with additional peremptory challenges in excess of those provided for by Rule or law, the defendant no longer has a vested substantial right to those challenges that he was provided merely as a result of the trial court's discretion. *See id.* (*citing United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)) (acknowledging that federal courts, and some state courts, do not find a defendant's use of a peremptory strike to compensate for the court's error in a "for cause" determination to violate any constitutional or rule-based right because the grant of peremptory challenges in those systems are purely within the trial court's discretion).

■■■■ To be clear, a trial judge acts within his or her discretion where, as here, he or she grants a criminal defendant more peremptory strikes than the Commonwealth receives. Trial judges are not impervious to errors in "for cause" strike determinations. Of course, at a certain point, a trial judge abuses his or her discretion by granting a criminal defendant *too many* extra strikes. However, in a capital case of this magnitude, we hold that Judge Woodall acted well within his discretion in awarding Appellant two extra peremptory strikes.

## 2. Excused Jurors: Trial Court's Grant of Commonwealth's Challenges for Cause.

Next, Appellant argues that the trial court improperly granted four of the Commonwealth's challenges for cause due to the jurors' alleged inability to impose the death penalty. He contends that dismissal of three of these prospective jurors was improper because despite their reservations and personal convictions against the death penalty, each of them indicated that they would be willing to consider and impose it. The fourth complained-of venire-member was excused because of a relationship to an expert witness but indicated during questioning he thought Appellant was probably mentally ill.

### a. Facts.

#### i. Juror H.C.

H.C. admitted that he is "not for the death penalty"; he described it as a "personal conviction." When the trial court asked him whether he would be "able to sign a verdict that sentences [Appellant] in this particular case to death," H.C. said "I don't believe I could." Although defense counsel got H.C. to say that he may be able to consider it, he later resubmitted that he would *not* be able to impose the death penalty. The Commonwealth moved to strike H.C. for cause and the trial court sustained the motion.

#### ii. Juror S.S.

S.S. admitted at the outset that she is opposed to the death penalty on religious grounds. She stated that she might be able to consider it but could not say unequivocally that she could impose it. The Commonwealth moved to strike S.S. for cause and the trial court sustained the motion.

#### iii. Juror C.J.

C.J. initially indicated that she could consider and impose the full range of penalties. However, she later admitted that she was opposed to the death penalty. When the trial court asked her to give her "best thought on whether [she] would be able to impose the death penalty in a case that involved three murders and three kidnappings among other things," she replied, "I don't know . . . probably not."

The Commonwealth moved to strike for cause. Defense counsel objected on the grounds that C.J. did not have personal or religious views that would impair her ability to impose the death penalty. The trial court sustained the motion to strike C.J. for cause.

#### iv. Juror R.W.

R.W. indicated that his daughter-in-law was the administrative assistant for Dr. Nicholas, the expert witness psychologist for the defense. Prior to being read a list of prospective witnesses, R.W. did not know that Dr. Nicholas had been retained by the defense, and stated that it would not affect his ability to be a neutral and impartial juror. The Commonwealth initially had no objection based upon this relationship.

During the defense's voir dire, R.W. expressed that he did not think that someone could commit the crimes to which Appellant pled guilty without "something being wrong" with him. When the Commonwealth asked him whether he meant "something mentally," R.W. said "possibly."

After questioning was complete, the Commonwealth moved to strike for cause, stating: "The more I think about this, the Commonwealth is concerned about this relationship between the daughter-in-law and Dr. Nicholas. It's pretty clear that Dr.

Nicholas is going to be one of the main witnesses for the defense.... I know what the man said, but I think that's just too close a relationship in this type of case." The trial court agreed, stating "the relationship part concerns me. Rather than have any chance at all that it would be a factor on his mind despite his stating that it wouldn't be, I'm going to grant the motion."

#### b. *Analysis.*

 Addressing a similar issue, we noted in *Brown:*

> [T]he United States Supreme Court recently reviewed its precedents in this area and found them to establish at least the following four principles:
>
>> First, a criminal defendant has the right to an. impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.... Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.... Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause, but if the juror is not substantially impaired, removal for cause is impermissible.... Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.
>
> *Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (citations omitted). The distinction the trial court must make under these prin-

ciples is not the simple one between potential jurors who oppose and those who favor capital punishment. It is the much more difficult distinction between potential jurors whose opposition to, or whose reservations about, capital punishment would "prevent or substantially impair the performance of [their] duties as ... juror[s] in accordance with [their] instructions and [their] oath[,]" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation and internal quotation marks omitted), and potential jurors whose reservations about capital punishment are as serious, perhaps, but who are capable, nevertheless, of considering capital punishment in circumstances where the General Assembly has deemed it an appropriate potential sentence.

313 S.W.3d at 598–99 (alterations in original). Thus,

> [I]t is the trial court's difficult task to distinguish between potential jurors whose [contrasting statements] reflect[ ] merely careful thinking and a strong sense of responsibility in the face of such an important decision and those jurors whose [contrasting statements] signal[ ] an impaired ability to abide by the jury instructions and to give to capital punishment the consideration Kentucky law requires. Because this distinction will often be anything but clear and will hinge to a large extent on the trial court's estimate of the potential juror's demeanor, the decision is one particularly within the trial court's discretion and is subject to reversal on appeal only for an abuse thereof. *Uttecht, supra.*

*Id.* at 599. Moreover,

> A juror is not disqualified ... merely because he or she "find[s] it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... [Nor is the test]

whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Stopher v. Commonwealth,* 57 S.W.3d 787, 797 (Ky.2001); *Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009).

*Harris v. Commonwealth,* 313 S.W.3d 40, 47 (Ky.2010). *See also Meece,* 348 S.W.3d at 700–04.

■ Thus, with respect to H.C., S.S., and C.J., the question is whether their responses to the questions of court and counsel indicated a substantially impaired ability to impose the death penalty. We hold that the trial court fairly concluded that their ability to impose the death penalty was substantially impaired, and it therefore did not abuse its discretion in removing those three jurors for cause.

■ With respect to R.W., Appellant contends the real reason he was excused was because he expressed an opinion about Appellant being mentally ill. However, the motion to strike was premised upon the relationship between R.W.'s daughter-in-law and Dr. Nicholas, and the trial court sustained that motion based upon the relationship. In *Bowman ex rel. Bowman v. Perkins,* we noted:

> A trial court should presume the possibility of bias of a juror if said juror has "a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims or witnesses," regardless of the answers said juror may give during voir dire. *Ward v. Commonwealth,* Ky., 695 S.W.2d 404, 407 (1985) (quoting *Commonwealth v. Stamm,* 286 Pa.Super. 409, 429 A.2d 4, 7 (1981)). "Once that close relationship is established, without regard to protestations of lack of bias, the court should

sustain a challenge for cause and excuse the juror." *Id.*

135 S.W.3d 399, 402 (Ky.2004). The trial court determined that R.W.'s familial relationship to Dr. Nicholas was close enough to cause some concern, and we hold that it did not abuse its discretion by striking R.W. for cause.

### 3. Permitting a Husband and Wife to Serve on Jury Together.

■ Next, Appellant argues that the trial court abused its discretion when it permitted a husband and wife, L.C. and D.C., to serve together on his jury over defense counsel's objection. He contends that permitting them to serve together on the jury violates his due process right to a fair and impartial jury. However, rather than argue that L.C. and D.C. were *actually* biased, he alleges that permitting them to serve together creates a scenario in which their connection creates the appearance of bias, *i.e.,* that they were *impliedly* or *presumptively* biased.

We recently addressed this very issue in *Harris,* 313 S.W.3d at 49. Like Appellant here, the appellant in *Harris* contended "that married jurors are presumptively not independent and that his right to an impartial jury was thus violated by the presence of a married couple on his jury." We disagreed. The following discussion from *Harris* explains:

> [O]f course, . . . under the Sixth and Fourteenth Amendments to the United States Constitution and Section 11 of the Kentucky Constitution, a criminal defendant is entitled to an impartial jury. To help protect that right, RCr 9.36 mandates that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In making this determination, the trial court is to

consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire, and is to keep in mind that generally it is the totally of those circumstances and not the response to any single question that reveals impartiality or the lack of it. "Impartiality," we reiterated recently in *Shane, supra,* "is not a technical question but a state of mind." 243 S.W.3d at 338. Indeed, we have held that notwithstanding a prospective juror's responses during voir dire, whatever his or her protestations of lack of bias, the juror's close relationship, "be it familial, financial or situational, with any of the parties, counsel, victims or witnesses," is sufficient to require the court "to sustain a challenge for cause and excuse the juror." *Marsch v. Commonwealth,* 743 S.W.2d 830, 833 (Ky.1988) (citing *Ward v. Commonwealth,* 695 S.W.2d 404 (Ky. 1985), internal quotation marks omitted); *Montgomery v. Commonwealth,* 819 S.W.2d 713 (Ky.1991). This is so, we explained, because however sincere and well meaning such prospective jurors may be, such close personal relationships are apt "subconsciously [to] affect their decision in the case." *Marsch,* 743 S.W.2d at 834. *See also, Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006) (collecting cases in which we have held that bias should have been presumed).

Bias, however, presumptive or otherwise, refers generally to a juror's favoring or disfavoring one side of the case or the other, a risk not posed by relationships between jurors. For that reason, the few courts to have addressed in published opinions the issue of married jurors have held that such jurors are not presumptively disqualified and that their independence may be adequately assured through voir dire. *See for example, State v. Richie,* 88 Hawai'i 19, 960 P.2d 1227 (1998); *Russell v. State,* 560 P.2d 1003 (Okla.Crim.App.1977); *State v. Wilkins,* 115 Vt. 269, 56 A.2d 473 (1948); *Savoie v. McCall's Boat Rentals, Inc.,* 491 So.2d 94 (La.App.1986). *We agree that no presumption of undue influence or lack of independence arises from the fact of marriage alone.* While a trial court would be within its discretion to avoid even the possibility of impropriety posed by married jurors by dismissing one or the other, the trial court did not abuse its discretion here.... [S]ince the jurors' responses included nothing that would have compelled a dismissal, the trial court cannot be said to have abused its discretion by permitting jurors 28 and 29 both to serve on Harris's jury.

313 S.W.3d at 49–50 (emphasis added).

Here, L.C. and her husband D.C. were both examined during individual voir dire by the Commonwealth, defense counsel, and the trial court. Defense counsel asked D.C. several questions about his ability to serve on the jury with his wife, although no such questions were asked of L.C.[19] Defense counsel made no motion to strike either L.C. or D.C. based on their answers to counsel's questions. Rather, just before the fourteen jurors were to be drawn, defense counsel objected to the couple serving on the jury together. The trial court denied the motion, and counsel did not request any further voir dire of either juror.

Because their responses included nothing that would have required a dismissal of them individually, and because a married couple serving together on a jury is not presumptively biased, we conclude that the trial court did not abuse its discretion in denying Appellant's motion.

---

19. L.C.'s voir dire examination occurred several days before her husband's.

### 4. Trial Court's Limitations in Individual Voir Dire.

■ Next, Appellant argues that the trial court violated his right to a fair and impartial jury by limiting individual voir dire. Specifically, he contends that the trial court improperly prevented him from questioning each individual juror about his or her feelings about the death penalty, and whether he or she would be able to consider the full range of penalties even if the defense presented no mitigation evidence.

■ "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Fields,* 274 S.W.3d at 393 (*quoting Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). However, "it is within the trial court's discretion to limit the scope of voir dire." *Fields,* 274 S.W.3d at 393 (*citing Webb v. Commonwealth,* 314 S.W.2d 543, 545 (Ky. 1958)). Appellate review of such a limitation is one for an abuse of discretion. *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky.2005).

In *Meece,* we concluded that "questions as to what a juror's feelings were about the death penalty or what purpose they thought the death penalty or the death penalty's deterrent effect served were properly prohibited." 348 S.W.3d at 700 (*citing Woodall v. Commonwealth,* 63 S.W.3d 104, 117 (Ky.2001); *Hodge,* 17 S.W.3d at 839). We see no reason to deviate from this rule now. Additionally, although the trial court did limit defense counsel's ability to pose theoretical questions regarding lower-range penalties, it was not an unreasonable limitation and was a proper exercise of the trial court's discretion.

### E. The Trial Judge's Denial of Appellant's Motion to Recuse was not Erroneous.

Appellant next argues that the trial judge, C.A. Woodall, III, erroneously failed to recuse himself. Specifically, he alleges that the fact that Judge Woodall presided over Kristy Frensley's divorce and custody proceedings, signing the final order awarding Kristy custody of Ethan approximately two weeks before Ethan's murder, rendered his impartiality questionable. In response, the Commonwealth contends that Appellant's motion to recuse was not timely filed, and even if it was, recusal was not warranted. We review a trial judge's denial of a motion to recuse for abuse of discretion. *See Hodge,* 68 S.W.3d at 345–46. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Judge Woodall presided over Kristy Frensley's divorce from Jeff Frensley. Jeff filed a motion for change of custody which Judge Woodall, after hearing extensive testimony, ultimately denied. On October 1, 2008, Judge Woodall entered a final order denying Jeff's motion for custody, keeping custody of Ethan with Kristy. Appellant committed the present crimes a mere fifteen days later.

On January 8, 2010, about one month before Appellant's trial was to begin, he filed a motion for the trial judge to recuse due to the previous divorce and custody proceedings. Appellant argued that the trial court's impartiality was questionable because: (1) it would be dealing with issues involving Kristy's credibility; and (2) it had "no doubt established, during the pendency of the divorce and custody proceedings, relationships with both Jeffrey and Kristy Frensley and quite possibly, the children involved." Accordingly, Ap-

pellant argued that it was "impossible to know whether the Court harbors any subconscious bias toward" him. Appellant's motion and defense counsel's oral argument on the motion make clear that he does not allege "that the court is, in fact, partial or that the court has exhibited any bias toward the defense," but that the judge's impartiality might reasonably be questioned.

At the hearing on Appellant's motion, defense counsel made the following argument:

Since Your Honor has, in fact, previously heard testimony from Kristy Frensley, and from the Findings of Fact and Conclusions of Law concluded that Ms. Frensley was credible, it is difficult for the defense to see how the judge could impartially weigh the testimony and credibility of Ms. Frensley in this trial should she testify, and obviously she *is* going to testify.

Your decision on the custody battle involving Ethan Frensley in which you denied Jeff Frensley's motion for custody and kept custody with Kristy Frensley, that order was entered on October 1, 2008, roughly fifteen days before Ethan Frensley was among the victims in this case. Judge, I don't know if it affected you, I don't see how it could not. You recently, within a matter of weeks, entered a ruling maintaining custody of Ethan with Kristy Frensley, and then two weeks later Ethan is murdered in the home of Kristy Frensley. I know you, Judge, and I know that had to affect you. And someone looking at this case either from a distance now or in case of a conviction and sentence years down the road, is going to look at that and say: "How could he not have some subconscious desire to see Mr. Dunlap convicted? And how could it not have affected his rulings?"

Judge Woodall responded:

The facts speak for themselves—I did decide the custody case and the timing was just as you said. As far as its effect on me, I think the effect of the death of any child, and in this case multiple children, would affect anyone who considers themselves compassionate. . . .

If I had it to do over again I probably would have disclosed that hearing before now because we would have addressed this issue before now. I don't know that disclosure is required because it is a matter of public record. . . .

As you may or may not be aware—and I know you have an active practice across the state—it is not unusual for litigants to appear before me in different roles. They may be in a custody case; they may be witnesses in a criminal case or a civil case; I may have someone in child support court who is a criminal defendant; I may have a defendant in a criminal case in one county who is a witness in a civil case or divorce case in another. So it's not surprising to you that there are all kinds of different factual situations which arise in a single-judge, four-county circuit that would make it a practical impossibility for me to disclose every potential relationship, and that's just the nature of my job.

Now obviously this is not a typical situation. . . . But, I tell you that to tell you that it's not as easy as just disclosing "I know this victim from that case."

In your motion you did talk about a relationship with the Frensley family and I don't know what would be the correct term, but the only thing I know about the Frensleys is what I knew from a couple of days of hearings in that case. I don't know them outside the courtroom. I don't know any facts about this

case from outside this courtroom. So I don't think that it's fair to characterize a sitting judge as having a relationship with parties litigant.

In terms of psychological bias, I'm going to allow you to ask me some questions if you want in a minute, and I affirm to tell the truth on those questions.... None of us know what our psychological biases are. My only bias toward Mr. Dunlap at this point is in his favor. In this court, and in any court in Kentucky and elsewhere, he's presumed innocent until proven guilty beyond a reasonable doubt or until he enters a knowing and voluntary guilty plea to a crime. And so my sympathy for what the Frensley family has been through in what can fairly be categorized as a heinous crime does not affect any standing that Mr. Dunlap has here before me because he's innocent until he's proven guilty. And frankly, I don't have any trouble making that separation....

I have neither formed nor expressed any opinion concerning the merits of these proceedings....

I just don't think that the facts of this case are such that a reasonable person would reasonably question whether I, as the sitting judge, based on a prior case involving the crime victims could reasonably be expected to be partial toward one side or the other.[20]

On those grounds, the trial court denied the motion to recuse.[21]

### 1. *Recusal Motion's Timeliness.*

■■■■ The Commonwealth initially argues that Appellant waived his right to raise a recusal motion by waiting until a month before the trial date to request it. The Commonwealth notes that the divorce and custody proceedings were public record, and that in a January 16, 2009 discovery exchange Appellant received a police report that mentions the Frensleys had recently been involved in a custody battle. Thus, the Commonwealth alleges that as of January 2009—one year prior to the motion for recusal—Appellant was on notice and had sufficient information with which to investigate the Trigg Circuit Court records and discover Judge Woodall's involvement.

■■■■ "A motion for recusal should be made immediately upon discovery of the facts upon which the disqualification rests." *Bussell v. Commonwealth,* 882 S.W.2d 111, 113 (Ky.1994) (*citing Bailey v. Bailey,* 474 S.W.2d 389 (Ky.1972); *Kohler v. Commonwealth,* 492 S.W.2d 198 (Ky. 1973)). "Otherwise, it will be waived." *Id.* It appears to us that Appellant's motion was timely. Although it was filed one year after Appellant was allegedly "on notice" of the divorce proceedings, and a month before trial was to begin, it appears to have been "made immediately upon discovery upon which the disqualification rests." Appellant's brief claims that the divorce and custody proceedings "came to light" shortly before trial, and Judge Woodall acknowledged at the hearing on the motion that he had not previously disclosed those proceedings to the defense. The Commonwealth directs us to no authority for applying an "on notice" rule for recusal motions, and we decline to do so. We therefore conclude that Appellant's motion was "timely."

### 2. *Recusal Motion's Merits.*

■■■■ Appellant argues that Judge Woodall erroneously failed to recuse himself

---

20. The trial court's written order is substantially the same.

21. Defense counsel declined the opportunity to ask the judge follow-up questions concerning bias.

because (1) he had previously determined Kristy Frensley to be a credible witness, and (2) he had "no doubt" developed a relationship with Kristy Frensley (and possibly her children) which would cause a reasonable person to question his impartiality.

KRS 26A.015(2)(e) provides: "Any justice or judge of the Court of Justice or master commissioner shall disqualify himself in any proceeding ... [w]here he has knowledge of any other circumstances in which his impartiality might reasonably be questioned." *See also* SCR 4.300, Canon 3E(1). "The burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" *Stopher*, 57 S.W.3d at 794 (*quoting Foster v. Commonwealth*, 348 S.W.2d 759, 760 (Ky.1961)). Appellant has failed to make the requisite showing.

We do not believe that Judge Woodall's presiding over the Frensley's divorce and custody proceedings creates the appearance of bias, or calls into question his impartiality. Judge Woodall had no relationship with the Frensleys outside the prior proceedings, and Ethan did not appear before the court in the custody case (although Kayla appeared briefly as a witness). Nor was Kristy's credibility at issue in Appellant's case. As the trial court's order noted, it would only be required to determine the *admissibility*, not the *credibility*, of evidence offered by Kristy's testimony, e.g., identifying Appellant as the perpetrator; "it is the jury that will determine the weight and credibility of the witness's testimony."

Further, we do not perceive—and Appellant does not allege—any actual bias from Judge Woodall. As the trial court noted: "The Court's only known bias towards Mr. Dunlap is in his favor: he is innocent until proven guilty beyond a reasonable doubt or until he enters a knowing and voluntary guilty plea."

Appellant cites us to several cases which are easily distinguishable from the case at bar. He relies heavily on *Sommers v. Commonwealth*, 843 S.W.2d 879 (Ky.1992). In *Sommers*, two young girls were abandoned by their parents and left in the care of their neighbors, the appellant and his wife. *Id.* at 880. The appellant's house later burned and the remains of the two girls were found in the ruins. *Id.* Evidence revealed that the girls died of suffocation before the fire consumed them. *Id.* The appellant was charged with and ultimately convicted of murdering both girls. *Id.*

After the appellant was indicted, the news media gave the case substantial coverage, including several criticisms of the district court judge who had presided over the guardianship proceedings and purportedly awarded limited guardianship of the girls to the appellant and his wife.[22] *Id.* at 880–81. The district court judge used media outlets to respond to the criticisms on several occasions, stating, for example, that if he had known that the appellant was indicted on drug charges he would not have granted him guardianship. The judge made several statements specifically about the appellant in the news media.

Shortly after the appellant's indictment, the district court judge was named interim circuit court judge and presided over the appellant's murder trial. The appellant moved for recusal on the grounds that

---

**22.** It appears that the news media reported that the judge had awarded limited guardianship to the appellant and his wife, but that the judge had not actually signed the order because the appellant failed to attend the hearing. *Id.* at 880–81.

impartiality might reasonably be questioned in view of all the circumstances—his involvement in the guardianship proceedings, his statements to the press following the indictment, his extra-judicial knowledge of [the appellant's] background, and his insistence on an October 23rd trial date while being a candidate for election in November, juxtaposed with the adverse publicity which he had received as a result of the girls' deaths. *Id.* at 881. The judge denied the motion to recuse, and this Court held that the denial constituted an abuse of discretion.

In the case at bar, we have none of the indicia of impartiality that existed in *Sommers*. Judge Woodall was not criticized in the media for awarding custody of Ethan to Kristy, nor did he use media outlets to justify his custody order after Ethan was murdered; and, in any event, he did not preside over a guardianship action involving Appellant like the judge in *Sommers* had. Judge Woodall never publicly made any comments about Appellant or the victims and had no extra-judicial knowledge of Appellant or the victims. Finally, in *Sommers,* the "proximity of the trial date to the forthcoming election, in view of all the circumstances, was a substantial and, we believe, not unreasonable factor...." *Id.* at 882. Here, there are no similar circumstances that could be looked upon as Judge Woodall trying to make amends for a previous lapse in judgment before an election in which he was a candidate. In short, none of the factors supporting recusal in *Sommers* are present in this case.

Finally, and perhaps most significantly, is the practical reality of judicial life in a rural, single-circuit-judge setting spanning four counties. Individuals appear before the court in different roles on a regular basis. A trial judge cannot be expected to recuse him- or herself whenever he or she has previously presided over the past dispute of a present party, victim, complaining witness, testifying witness, or accused. Without some appearance of impartiality, recusal is unnecessary. Here, we perceive no appearance of impartiality, and no actual bias is alleged. We therefore conclude that the trial judge did not abuse his discretion in denying Appellant's recusal motion.

## F. The Commonwealth's Cross–Examination of Dr. Nicholas was Proper.

Appellant next argues that the Commonwealth engaged in an improper cross-examination of Dr. Nicholas. Specifically, he contends that the prosecutor elicited irrelevant testimony concerning Dr. Nicholas's previous participation as an expert witness for the defense in an unrelated child-murder case. Additionally, he alleges that the Commonwealth's line of questioning was unduly prejudicial.

During the Commonwealth's cross-examination of Dr. Nicholas, the following exchange occurred:

*Commonwealth:* You're getting paid to be here today, aren't you?

*Dr. Nicholas:* I hope so.

*Commonwealth:* You charge by the hour?

*Dr. Nicholas:* Yes, I do.

*Commonwealth:* Is it not fair to say that you testify quite a bit for the defense?

*Dr. Nicholas:* Yes.

*Commonwealth:* Not too much for the Commonwealth?

*Dr. Nicholas:* I did once for someone in your office.

. . . .

*Commonwealth:* Have you heard of *Commonwealth v. Phillip Knee?*

*Dr. Nicholas:* I remember his case, yes.

*Commonwealth:* It was a case involving the killing of a child, wasn't it?

*Dr. Nicholas:* I don't know what the final charges were.

At this point, defense counsel objected on the grounds that the line of questioning was irrelevant. The Commonwealth answered that "it goes to bias," and the trial court overruled the objection. The exchange resumed:

*Commonwealth:* Do you recall testifying in the case of Mr. Knee?

*Dr. Nicholas:* Yes.

*Commonwealth:* And you're not familiar with the facts of the case as far as the charge?

*Dr. Nicholas:* I vaguely recall him. I see a lot of patients. I do a lot of cases.

*Commonwealth:* Do you recall that this was a case involving a child murder?

*Dr. Nicholas:* Yes. Well it was involving the death of a child. I don't know what the final charges were or what he was convicted of.

*Commonwealth:* Do you know what he was charged with, what he was on trial for when you testified for him?

*Dr. Nicholas:* I testified for him months ago and I've probably seen several hundred people in my office since then.

*Commonwealth:* Would it surprise you to know that it was murder?

*Dr. Nicholas:* No.

### 1. The Commonwealth's Line of Questioning was Relevant to Bias, Motive, and Credibility.

■ Appellant argues that the trial court erroneously overruled his objection that the Commonwealth's line of questioning sought to elicit irrelevant testimony. Because this issue is preserved by said objection, the trial court's response will be reviewed for abuse of discretion. *See Penman,* 194 S.W.3d at 245. "The test for

abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

■ "[*Relevant evidence*] means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. "A 'fact that is of consequence to the determination of the action' includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense. Relevancy is established by any showing of probativeness, however slight." *Springer v. Commonwealth,* 998 S.W.2d 439, 449 (Ky.1999). "Evidence which is not relevant is not admissible." KRE 402. Additionally, we have noted:

> The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Evidence of a witness' bias, hostility, or interest is germane to the question of credibility and should be presented before the jury.

*McBeath v. Commonwealth,* 244 S.W.3d 22, 36 (Ky.2007) (citations and internal quotation marks omitted).

The Commonwealth's line of questioning was a proper method of exploring Dr. Nicholas's partiality and biases. *See id.* It was relevant to the question of credibility and it potentially affected the weight the jury assigned his testimony. *See id.* It also exposed that Dr. Nicholas had a financial interest in testifying on Appellant's behalf. Accordingly, the trial court

did not abuse its discretion by overruling Appellant's objection.

## 2. The Commonwealth's Line of Questioning was not Unduly Prejudicial.

 Appellant next argues that the Commonwealth's line of questioning was unduly prejudicial. This issue is unpreserved.

KRE 403 provides that even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice...." The Commonwealth's line of questioning was probative for a number of reasons. As previously noted, it exposed that Dr. Nicholas had a financial interest in testifying on Appellant's behalf, and it revealed a potential defense bias. Additionally, it not only established that Dr. Nicholas had testified in another significant trial for the defense but that he had little memory of that previous trial. The lack of memory suggested that Dr. Nicholas was indiscriminate in the number of cases he took. Speaking of Phillip Knee, the murder defendant in the previous case, Dr. Nicholas stated: "I vaguely recall him. I see a lot of patients. I do a lot of cases." Thus, the Commonwealth's line of questioning revealed that Dr. Nicholas worked on so many cases that he could not remember even the more significant ones.

Appellant cites this Court to *Minnesota v. Blasus*, 445 N.W.2d 535 (Minn.1989) as authority supporting reversal. In *Blasus*, the prosecutor attempted to demonstrate that Dr. Stephans was not a disinterested witness, but had a defense bias. The prosecutor established that Dr. Stephans had not testified against a defendant in a criminal case since 1983 or 1984. The prosecutor then asked if Dr. Stephans had "testified for the defense in the Jurgen's case?" The defense objection was overruled on the basis that the defense had opened the door by inquiring into various areas where the witness had testified. The prosecutor then asked about the *State v. Ming Sen Shiue*, 326 N.W.2d 648 (Minn.1982), *State v. Hoffman*, 328 N.W.2d 709 (Minn.1982), *In re Guardianship of Mikulanec*, 356 N.W.2d 683 (Minn.1984) and *Rairdon* cases and established that, with the exception of the *Hoffman* case, Dr. Stephans and Dr. Perkins had worked together in all these "recent major criminal cases."

*Id.* at 538–39. The Supreme Court of Minnesota held that this line of questioning was relevant to bias and to correct a false impression left by the defense that Dr. Stephans testified equally often for both parties. *Id.* at 539. However, the court agreed with the appellant that the questioning was unduly prejudicial because it "placed [the] appellant in the same category as the defendants in the[ ] brutal murder cases" in which Dr. Stephans had previously testified. *Id.* "[A]ny impression that Dr. Stephans testified equally often for the prosecution as for the defense had already been corrected before the prosecutor launched into the objectionable questions." *Id.* at 540. "[T]he murders referred to were gruesome and reprehensible, and the prosecution intended the jury to mentally link appellant with the frightening violence of these other cases, as is evident by the remarks in closing argument." *Id.* Thus, the Court reversed and remanded for a new trial. *Id.*

The same issues simply do not exist here. To begin with, the prosecutor only asked Dr. Nicholas about one specific case that he had previously testified at. In *Knee v. Commonwealth*, No. 2009–CA–002194–MR, 2011 WL 1706612 (Ky.App. May 6, 2011), Phillip Knee was convicted of second-degree manslaughter for the

death of his girlfriend's infant child. *Id.* at *1. The child had been suffering from nasal congestion and could not breathe through his nose. *Id.* Knee placed a bottle in the child's mouth to stop him from crying and kept it there even when the child attempted to move it to breathe. *Id.* The child died as a result. *Id.*

Although the facts of the *Knee* case are tragic, it is not the sort of "gruesome and reprehensible" murder case the prosecutor tried to "mentally link" the appellant in *Blasus* with. 445 N.W.2d at 540. Nor is it alleged that *Knee* was a high-profile or otherwise infamous case with which the jury would have been familiar. Rather, it is our opinion that this was a proper method with which to expose bias on cross-examination.

### G. Introduction of Photographs was Proper.

■ Appellant next argues that the trial court erroneously denied his "Motion to Exclude Gruesome Photographs." He alleges that none of the over fifty pictures introduced by the Commonwealth, which he characterizes as "gruesome" and/or "duplicative," were necessary to prove a point in controversy. Thus, he contends, the photographs created undue prejudice substantially outweighing their probative value.

"[*Relevant evidence*] means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. "Evidence which is not relevant is not admissible." KRE 402. Even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice. . . ." KRE 403.

Despite Appellant's guilty plea, the Commonwealth was entitled to explain the circumstances surrounding the crimes and the extent of harm inflicted. Furthermore, the photographs served as proof of the malice necessary to establish the appropriateness of the death penalty. Additionally, the photographs were relevant to prove the existence of aggravating circumstances. *See* KRS 532.025.[23]

■ For example, one of the aggravating circumstances asked the jury whether it believed "[Appellant's] act or acts of killing were *intentional* and resulted in multiple deaths." (Emphasis added). Thus, intent was a "fact that [was] of consequence." KRE 401. In *Parker v. Commonwealth,* we held that "[p]roof of intent in a homicide case may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable conse-

---

**23.** KRS 532.025(2) provides, in relevant part:

> In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence:
>
> . . . .
>
> 2. The offense of murder or kidnapping was committed while the offender was engaged in the commission of arson in the

> first degree, robbery in the first degree, burglary in the first degree, rape in the first degree, or sodomy in the first degree;
>
> . . . .
>
> 6. The offender's act or acts of killing were intentional and resulted in multiple deaths. . . .

Subsection (3) of that statute provides:

> The jury, if its verdict be a recommendation of death . . . shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. . . .

quences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." 952 S.W.2d 209, 212 (Ky.1997). Even though Appellant pled guilty, the photographs were still relevant to intent by demonstrating the extent of the injuries. "The Commonwealth has a right to prove its case to the jury even when the defendant pleads guilty." *Gall*, 607 S.W.2d at 107. And, "[t]his court knows of no rule or principle of law that requires the Commonwealth's Attorney to try his case by stipulation." *Greene v. Commonwealth*, 197 S.W.3d 76, 86 (Ky.2006) 9 (*citing Payne*, 623 S.W.2d at 877).

Here, the photographs helped illustrate the circumstances surrounding the crimes. They also aided the medical examiner in explaining the nature, extent, and cause of the injuries, and helped establish that the person who' inflicted the wounds intended to cause the victims' death. And,

> [i]t is no answer to say that defense counsel offered to stipulate the essential facts proved by the pathologist and illustrated by the photographs, hence they were unnecessary. The Commonwealth has a right to prove its case to the jury even when the defendant pleads guilty. The defendant is not entitled to erase the ugly parts of the picture and substitute words in their place. In order for a jury to be able to size up a case fairly and wisely it must be allowed to gain a reasonable perspective, and that can best be done by permitting it to see an unadulterated picture.

*Id.* The photographs were therefore relevant.

It is well-established that otherwise admissible photographs are not excludable simply because they are gruesome and the crime is heinous. *See, e.g., id.* at 106–07; *see also Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006); *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky.1992); *Holland v. Commonwealth*, 703 S.W.2d 876, 879 (Ky. 1985); *Brown v. Commonwealth*, 558 S.W.2d 599, 605 (Ky.1977). Appellant, however, cites us to *Clark v. Commonwealth*, 833 S.W.2d 793 (Ky.1991) as requiring reversal here. In *Clark*, we noted the general rule that relevant pictures are not excludable simply because they are gruesome "loses considerable force when the condition of the body has been materially altered by mutilation, autopsy, decomposition or other extraneous causes, *not related to commission of the crime....*" *Id.* at 794–95 (emphasis added). Here, however, the decomposition of Ethan and Kortney's bodies was directly attributable to the commission of a crime, *i.e.*, arson, to which Appellant pled guilty. Appellant's argument is therefore without merit.[24]

## H. The Trial Court Properly Denied Appellant's Motion to Suppress and Properly Permitted the Jury to Watch the Videotaped Statement.

Appellant next argues that the trial court erred in denying his motion to suppress statements he made to law enforcement officers that were allegedly obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Section Eleven of the Kentucky Constitution. Specifically,

---

**24.** Even if we were to conclude that the prejudice caused by the photographs substantially outweighed their probative value, we do not think this rises to the level of reversible error. Given the nature of the crimes and other evidence introduced at trial, including Kristy

Frensley's emotional testimony, we could "say with fair assurance that the judgment was not substantially swayed by the error." *Brown*, 313 S.W.3d at 595 (*citing Kotteakos*, 328 U.S. 750, 66 S.Ct. 1239 (1946)).

he contends that when the police arrived at his house to question him he was placed in custody, without being given his *Miranda* warnings, and thus any statements made thereafter were inadmissible. He also argues that his statements should have been excluded as irrelevant, KRE 402, or, in the alternative, as unduly prejudicial and cumulative under KRE 403. These issues are preserved.

### 1. The Trial Court Properly Denied Appellant's Motion to Suppress.

Law enforcement obtained a search warrant and arrived at Appellant's home on October 18, 2009—three days after the murders. Detective Sam Steger, the supervising detective that morning, made contact with Appellant and asked him one question: "Do you know why we are here?" Appellant responded: "About the Roaring Springs thing," which is a reference to the area where the murders occurred. This was the only substantive question asked of Appellant at his home.[25]

 Detective Steger conceded that Appellant was in custody and that he had not read Appellant his *Miranda* rights.[26] Although Appellant was not placed under arrest at his home, he was detained for officer and bystander safety upon law enforcement's arrival, and he was not free to leave. It is undisputed, therefore, that he was "in custody" for *Miranda* purposes when Detective Steger asked him the initial question.

The officers brought Appellant back to the Christian County Sheriffs Office where Appellant was read his *Miranda* rights, which he waived in writing. During his five-hour interview, Appellant denied any involvement in the crimes, asserted he was not in Roaring Springs on the date in question, and maintained that his answer to Detective Steger's question was the product of media coverage, and not premised upon any personal knowledge he possessed.

Appellant filed a pretrial motion to suppress and the trial court held a suppression hearing in May 2009. Appellant alleged that his answer to Detective Steger's question was inadmissible because he had not been Mirandized and any statements made thereafter were also inadmissible because they were tainted by the initial un-Mirandized interrogation. The trial court's subsequent order made the following conclusions of law relevant to our discussion: (1) Detective Steger's question amounted to an "interrogation" under *Miranda*, and "since the Defendant was in custody, given the presumption of inherent coerciveness without *Miranda* warnings, the unwarned statement must therefore be suppressed"; and (2) relying on *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Appellant's statements at the Sheriffs Office were not "tainted" by his earlier, non-admissible statement, were given voluntarily after a valid waiver of his rights, and were therefore admissible.

Resolution of this issue requires us to address three sub-issues. First, we must determine whether Appellant, by virtue of his guilty plea, waived his right to challenge the trial court's denial of his suppression motion. If not, we must then determine whether Detective Steger's un-Mirandized question, "Do you know why we are here," constitutes custodial interrogation in violation of *Miranda* and thereby renders Appellant's answer to that question inadmissible. And, if we answer that

---

25. The only other question asked of Appellant was if he would accompany the detectives to the Sheriff's Office.

26. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

question affirmatively, we must finally determine whether the initial exchange between Detective Steger and Appellant tainted Appellant's subsequent Mirandized statement at the Sheriff's Office, warranting suppression. In doing so, we deem the trial court's findings of fact conclusive if supported by substantial evidence, *Adcock*, 967 S.W.2d at 8; RCr 9.78, and review *de novo* the application of law to those facts (if supported), *Welch*, 149 S.W.3d at 409.

### a. Appellant did not waive his right to challenge the denial of his suppression motion by virtue of pleading guilty.

 The Commonwealth argues that Appellant waived his right to challenge the trial court's denial of his suppression motion by virtue of his unconditional guilty plea. Summarizing our jurisprudence on this issue, we noted in *Thompson v. Commonwealth* that

> the entry of a valid guilty plea effectively waives all defenses other than that the indictment charged no offense. Further, a guilty plea constitutes a break in the chain of events, and the defendant therefore may not raise independent claims related to the deprivation of constitutional rights occurring before entry of the guilty plea. Where a defendant has entered an unconditional plea of guilty, he may not later challenge allegedly improper lineup identifications or the police's failure to provide *Miranda* warnings.

147 S.W.3d 22, 39 (Ky.2004) (citations omitted), *superseded by statute on other grounds as recognized in Jackson v. Commonwealth*, 363 S.W.3d 11, 19 n. 3 (Ky. 2012). *See also Blackledge v. Perry*, 417 U.S. 21, 29–30, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) (summarizing U.S. Supreme Court's jurisprudence with regard to effect of guilty plea on challenging rights violations at subsequent habeas action). What is unclear from our precedents, however, is whether this rule applies equally to situations like the one at bar where a defendant preserves his right to be sentenced by a jury for his capital crimes.

The Supreme Court of Georgia addressed a similar issue in *Christenson v. Georgia*, 261 Ga. 80, 402 S.E.2d 41 (1991). In *Christenson*, the defendant was charged with murder and theft of the victim's automobile. *Id.* at 44. He pled guilty to the theft and was convicted by a jury of murder. *Id.* at 44, 51. During the sentencing phase, the prosecution offered into evidence a statement the defendant made after his arrest for theft. *Id.* at 51. The defendant requested a hearing to determine whether the statement was voluntary and whether he had been informed of and waived his *Miranda* rights. *Id.* The prosecution argued that was unnecessary because he had pled guilty to theft and thereby waived any objection to the interrogation, *id.*; the trial court agreed with the prosecution and denied the motion. *Id.*

The Supreme Court of Georgia disagreed, holding that the defendant's guilty plea to automobile theft did not waive his right to a hearing to determine the statement's admissibility. *Id.* The Court concluded:

> By his plea of guilty, the defendant undoubtedly waived any such issue concerning his conviction. See LaFave and Israel, *Criminal Procedure*, ch. 20, § 20.6(a) (Rights Waived or Forfeited by Plea) (Vol II, West 1984). But we do not find that he "waived the use of an inadmissible statement at the sentencing phase of [this death-penalty] trial."

*Id.* (*quoting Hatcher v. Georgia*, 259 Ga.

274, 379 S.E.2d 775 (1989)).[27] Accordingly, the court vacated the death sentence and remanded for a hearing on the admissibility of the statement.

We are persuaded by this analysis and hold that a guilty plea does not waive a challenge to the penalty phase admissibility of a statement allegedly procured in violation of *Miranda.* First, *Miranda* warnings are a prophylactic measure "to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In *Estelle v. Smith,* the Supreme Court held that this Fifth Amendment right is equally applicable to the guilt and penalty phases of a bifurcated trial:

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.

451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (citations omitted).

Second, we have previously stated that a guilty plea "waives all defenses to the *original* charges" (other than that the indictment fails to charge an offense). *Corbett v. Commonwealth,* 717 S.W.2d 831, 832 (Ky.1986) (emphasis added). Appellant is not challenging his convictions to the original charges, but rather alleging a procedural defect of constitutional magnitude in his penalty phase. We therefore conclude that Appellant did not waive this issue in the penalty phase by virtue of pleading guilty during the guilt phase.

***b. The exchange between Detective Steger and Appellant constitutes "custodial interrogation."***

▆ Next, we must determine whether Detective Steger's question, "Do you know why we are here," constitutes custodial interrogation under *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. It is uncontested that Appellant was in custody at the time. Thus, the only issue is whether there was an *interrogation* as defined by law. "[T]he term [*interrogation*] under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We conclude that Detective Steger's question does constitute an "interrogation" for *Miranda* purposes.

▆ First, Detective Steger knew, or should have known, that it was reasonably likely to elicit an incriminating response (which, incidentally, it did). Detective Steger even testified that he considered Appellant's response incriminating. Second, although it could be argued that the question is one that is "normally attendant to arrest and custody," *Innis,* 446 U.S. at 301, 100 S.Ct. 1682, it is not the sort of

---

**27.** The court went on to note that a guilty plea "ordinarily renders harmless the admission into evidence of facts regarding the crime or crimes charged which are included in the guilty plea." *Id.* However, "the admission into evidence of facts beyond the scope of the guilty plea [cannot be held] harmless." *Id.* The *Christenson* court could not hold the error harmless because the statement "was not merely cumulative to his guilty plea; the defendant stated to his interrogatory that he would have killed to steal the truck if it had been necessary." *Id.* Similarly, in the case at bar, the statement sought to be introduced was not simply an admission to facts already acknowledged as true by virtue of a guilty plea; rather, it was a wholesale denial of any involvement in the crimes.

"booking question" for which a *Miranda* exception has been created. *See, e.g., Pennsylvania v. Muniz,* 496 U.S. 582, 601–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Questions falling under this exception have been characterized as those " 'reasonably related to the police's administrative concerns,' such as the defendant's name, address, height, weight, eye color, date of birth and current address." *United States v. Pacheco–Lopez,* 531 F.3d 420, 423 (6th Cir.2008) (*quoting Muniz,* 496 U.S. at 601, 110 S.Ct. 2638).[28]

We acknowledge that the Supreme Court of Rhode Island has come to the opposite conclusion, albeit in dicta,[29] concerning the same "Do you know why we're here?" question. *See Rhode Island v. Paul,* 792 A.2d 42, 45–46 (R.I.2002). In *Paul,* the defendant argued that his confession should be suppressed based in part upon his un-Mirandized answer to this question. *Id.* at 45. The court opined that "[s]imply inquiring about defendant's knowledge of why the police would be at his residence that morning is a preliminary question. The question '[d]o you know why we're here' invites only a 'yes' or 'no' answer, it is not an invitation for defendant to incriminate himself." *Id.* This statement ignores the following crucial points: (1) the test for "interrogation" is not whether the question *invites* an incrimination, but whether it is *"reasonably likely* to elicit" an incriminating response, *Innis,* 446 U.S. at 301, 100 S.Ct. 1682 (emphasis added); (2) one of the answers this particular question invites—*i.e.,* "yes"—is often incriminating; (3) "the *Innis* test focuses primarily upon 'the perspective of the suspect,' " *Illinois v. Perkins,* 496 U.S. 292,

296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), and the defendant in *Paul* had allegedly been on a three-day drug and alcohol binge before the police "intercepted" him in his backyard, *Paul,* 792 A.2d at 44–45; and (4) the question *did* elicit an incriminating response: "Because [Jimmy] was missing." *Id.* at 44. We therefore disagree with the Supreme Court of Rhode Island.

Our conclusion is reinforced by another similar case. In *Wisconsin v. Cleaver,* law enforcement was called to the defendant's home and informed of a dead infant found in the defendant's closet. 706 N.W.2d 702 (Wis.Ct.App.2005) (unpublished table decision). The defendant was suspected of murdering the infant, retrieved from her place of employment, taken back to her home, and delivered to an officer investigating at the scene of the crime. *Id.* Without advising the defendant of her *Miranda* rights, the officer asked her: "Do you know why we're here today?" The defendant answered either "because of my baby" or "because of what you found in my basement." *Id.* The trial court found that under the totality of the circumstances the officer's question constituted an interrogation and, finding that the defendant was in custody at the time, it suppressed her statement. *Id.* The appellate court affirmed. *Id.*

Finally, in *Elstad,* (which will be discussed in greater detail *infra*), the U.S. Supreme Court treated a similar, albeit slightly longer, interaction as a custodial interrogation. 470 U.S. at 301, 105 S.Ct. 1285. In *Elstad,* law enforcement asked the respondent, an eighteen-year-old who

---

**28.** However, in certain circumstances even these "booking questions" can be "reasonably likely to elicit an incriminating response," and therefore constitute a custodial interrogation. *See Muniz,* 496 U.S. at 601, 110 S.Ct. 2638; *Pacheco–Lopez,* 531 F.3d at 423–24.

**29.** The *Paul* court noted that this issue was not raised in the trial court and had therefore been waived. 792 A.2d at 45. The court nevertheless addressed the issue.

was suspected of burglary and for whom they had an arrest warrant, whether he knew why they were at his home. *Id.* He said "no." *Id.* An officer then asked the respondent whether he knew a certain individual (who happened to be the burglary victim); *Id.* The respondent admitted he did know that person and shortly thereafter admitted that he was at the person's home when the burglary occurred. *Id.* He had not been given *Miranda* warnings. *See id.* The state conceded that this brief interaction was a custodial interrogation, *id.* at 302, so that issue was not before the U.S. Supreme Court. However, the Court assumed it to be true in addressing the question on which it granted certiorari.[30]

In sum, we hold that Detective Steger's question to Appellant, "Do you know why we are here?" constitutes a custodial interrogation under the facts of this case. Detective Steger arrived at Appellant's home with several law enforcement officers and the S.W.A.T. team; under these circumstances, he should have reasonably expected an incriminating response. That is not to say, however, that an incriminating response was *coerced.* As *Elstad* explains, "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against Compulsory self-incrimination has not been intelligently exercised." *Id.* at 310, 105 S.Ct. 1285. Ap-

plying this presumption, as we must, we conclude the trial court properly suppressed Appellant's answer to Detective Steger's unwarned question.

### c. Appellant was not entitled to suppression of his subsequent Mirandized statement.

■ Finally, Appellant argues that the statement he gave to detectives at the Christian County Sheriff's Office should have been suppressed because, although he had been properly Mirandized by that point, it was tainted by the previous un-Mirandized exchange between him and Detective Steger. We disagree.

As previously noted, in *Elstad,* law enforcement asked the respondent whether he knew why they were at his home. *Id.* at 301, 105 S.Ct. 1285. He responded that he did not, but after another brief exchange he admitted he knew the person who had been burglarized and that he was at the person's home when the burglary occurred. *Id.* He had not been given *Miranda* warnings. *See id.* Later, at the Sheriff's Office, the defendant was read his *Miranda* rights and, after waiving those rights, he provided a statement acknowledging his role in the crime.[31] *Id.*

The respondent argued that both statements must be suppressed—the un-Mirandized oral statement " 'let the cat out of

---

**30.** The question before the *Elstad* court was "whether the Self-incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id.* at 303, 105 S.Ct. 1285. This is the precise question addressed in the following subsection.

**31.** Because the respondent's unwarned statement and subsequent Mirandized statement were both incriminating, the Supreme Court's

opinion in *Elstad* refers to them as "confessions" or "admissions." In the case at bar, neither Appellant's unwarned answer to Detective Steger's question nor his later statement to police was inculpatory. However, the Fifth Amendment *Miranda* analysis applies to inculpatory and exculpatory statements alike. *See Rhode Island v. Innis,* 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.").

the bag' and tainted the subsequent confession as 'fruit of the poisonous tree.' " *Id.* at 302, 105 S.Ct. 1285 (citations omitted). The Supreme Court disagreed, initially noting that the "fruit of the poisonous tree" doctrine was a remedy for Fourth Amendment "search and seizure" violations and inapplicable to Fifth Amendment *Miranda* violations. *Id.*

Instead, the Court determined that properly-warned statements made subsequent to an un-Mirandized statement should be looked at with an eye toward what *Miranda* was most concerned with: coercion. *Id.* at 309, 105 S.Ct. 1285.

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* This is precisely the situation presented by this case: although Detective Steger failed to issue *Miranda* warnings, thereby rendering Appellant's "[a]bout the Roaring Springs thing" response inadmissible, the trial court found that his question was "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will. . . ." *Id.* Thus, we must determine the admissibility of Appellant's subsequent, post-warning statement by whether it was "knowingly and voluntarily made," or whether it was coerced.

With respect to this question, Appellant argues that he was compelled to explain his answer to Detective Steger's unwarned question, thereby rendering his Mirandized statement not truly voluntary. However, this is the very same "cat out of the bag" theory the Supreme Court debunked in *Elstad* where it noted that it "has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or. compromises the voluntariness of a subsequent informed waiver." *Id.* at 312, 105 S.Ct. 1285. "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.* Thus,

> absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314, 105 S.Ct. 1285.

In the case at bar, the trial court made the following relevant findings of fact: (1) "Detective Sgt. Steger's actions and question were not coercive or abusive"; (2) "[Appellant] was advised of his *Miranda* rights [at the Sheriff's Office] and checked each of them on a written form and stated he understood them and he voluntarily waived them and would make a statement without counsel present"; (3) "[n]either interviewing officer saw any indication that the Defendant was intoxicated or otherwise unable to speak on an intelligent and

voluntary basis"; (4) "[t]he interview itself was not coercive or abusive"; and (5) "[t]here is no proof that [Appellant]'s waiver of his *Miranda* rights was anything other than voluntary. [Appellant]'s waiver of his *Miranda* rights at the Sheriffs office was made knowingly, rationally, and intelligently." These uncontested facts are supported by substantial evidence and are therefore deemed conclusive.

■ Applying the law to these facts, we hold that the trial court properly denied Appellant's motion to suppress the statement he gave to the detectives at the Christian County Sheriff's Office. Although Appellant's answer to Detective Steger's initial question must be suppressed as presumptively coercive, *id.* at 309, 105 S.Ct. 1285, "[n]o further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver," *id.* at 318, 105 S.Ct. 1285. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* Accordingly, suppression of Appellant's Mirandized statement was unwarranted.

### 2. *The Trial Court Properly Permitted the Jury to Watch Appellant's Recorded Interview.*

■ Having concluded that the trial court properly denied Appellant's motion to suppress the statement he gave to law enforcement at the Christian County Sheriff's Office, we must now address whether portions of that recorded statement were properly played for the jury.[32] Appellant argues that his videotaped statement was not relevant to any fact of consequence in his sentencing trial, and therefore should

have been excluded. In the alternative, he contends that even if it was minimally relevant, its probative value was substantially outweighed by undue prejudice because it merely showed that Appellant initially lied to police about his involvement. He also contends that this evidence had already been presented to the jury so the video was cumulative.

Again, we point out that "[*relevant evidence*] means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. "A 'fact that is of consequence to the determination of the action' includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense. Relevancy is established by any showing of probativeness, however slight." *Springer,* 998 S.W.2d at 449. "Evidence which is not relevant is not admissible." KRE 402.

The Commonwealth introduced portions of Appellant's videotaped statement to counter Appellant's anticipated mitigation defense that he was mentally ill at the time of the murders and that the AVM on his brain affected his judgment and discretion. The videotaped interview, recorded a mere three days after the crimes, was intended to deflate Appellant's mental illness defense. In this light, we agree that the video had probative value. As the Commonwealth notes, "Appellant attempts to argue that his rape and attempted [murder] of a mother and the murder of her three children were caused by a brain defect but that this same defect had no manifestation in any of his answers, actions, mannerisms, or character as seen in the videotaped statement to police." Because Appellant's mitigation evidence consisted in large part of medical evidence of

---

**32.** The entire statement was not played for the jury due to sound-quality issues.

the AVM in his right frontal lobe, and the possible effect such a malformation would have on his ability to control his judgment and discretion, we conclude that the videotape was not improperly admitted as it would certainly be relevant to the issue of his judgment and discretion.

██ Nor do we think its probative value is substantially outweighed by the danger of undue prejudice. Appellant argues that the video "merely showed to the jury that Dunlap initially lied to the police about his involvement. This evidence had already been presented to the jury and the video was cumulative and unduly prejudicial." His argument misses the point. The video was not introduced to demonstrate that Appellant lied to police, but rather that he did not appear to be suffering from a mental illness or brain defect impairing his judgment or discretion. The trial court therefore properly overruled Appellant's motion to exclude the videotape.

## I. The Trial Court did not Abuse its Discretion by Denying Appellant's Motion for a Mistrial and Change Of Venue.

Appellant next argues that the trial court erred by failing to declare a mistrial and change of venue after a threatening letter was sent from an unknown source to the Commonwealth's Attorney. This issue is preserved.

Amid the jury selection phase, the Commonwealth's Attorney received a letter, sent to his post office box and addressed to him personally, with no return address. It reads:

G.L. Ovey [Commonwealth's Attorney]: I cannot believe what is going on at the Livingston County Justice Center. This [defense counsel] Jim Gibson questions are way out of reason and a disgrace to the people of this County. [Illegible] leaving the courtroom in tears and very upset. If I could file a lawsuit against the whole judicial system and one of these mornings someone will be there or before they get there and it will be a disaster just like Columbine School. This man is guilty and admitted to all of it. 2 fine teenage girls and a nice 5 year old boy and a nice 37 yr old woman who will suffer the rest of her life. So I personally feel he should get the death penalty. I have known you for several years and had been in court when you were there and knowing like I do you should demand the death penalty and I am glad I am not on the jury pool because Dunlap and Gibson would both be dead. So if you want to continue in Livingston County you better be doing something soon to stop this as I have wrote to [Judge] C.A. Woodall also and I don't think much of him I have heard a lot about him in Trigg County and other [Counties] and he is walking on pretty thin ice. He should stop this Jim Gibson line of questions and that's my opinion so you can take it from there. I may see you in a few days.

/s/ [illegible]

Appellant moved for a mistrial and a change of venue based upon the "chilling effect" the letter's contents had on defense counsel. The Commonwealth's Attorney objected to the motion, stating that he did not perceive the letter as a direct threat, and "[a]s far as a chilling effect, I can't see that. This trial has been security conscious and one letter doesn't provide grounds for a mistrial."

The trial court denied Appellant's motion, stating:

It's one of those things none of us are happy to see. Mr. Ovey advised me of the general content of the letter yesterday. And I have spoken with court

security officers and they are ready to deal with any unforeseen contingencies. As far as a chilling effect on counsel, I can appreciate that. I, too, construe it as a threat, but I know that counsel had prepared before this came to light. But I'm going to deny the motion for mistrial and as far as change of venue, none of us know how many cranks there are in any particular county. We've come to the brink of getting this case resolved. So I'm going to deny the motion [for a change of venue].

Appellant contends that the trial court's ruling violated his Sixth Amendment right to counsel in that the defense team had to operate under a death threat and could not devote its full attention to his defense. Although courthouse security was on heightened alert, Appellant alleges that to "proceed with the entire trial, knowing that one must walk away from the courthouse, enter one's car, drive to another location, and make the round trip the next day, every day, would have a chilling effect on anyone, and necessitate that they 'tone down their defense.'"

### 1. Denial of Motion for Mistrial was not Abuse of Discretion.

 "Whether to grant a mistrial is within the sound discretion of the trial court, and 'such a ruling will not be disturbed absent ... an abuse of that discretion.'" *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky.2005) (*quoting Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky.2004)), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010). "A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity." *Id.* (*citing Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985)). "The error must be 'of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way [except by grant of a mistrial].'" *Id.* (*quoting Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky.1996)). *See also Radford v. Lovelace*, 212 S.W.3d 72, 80 (Ky.2006) ("[M]ost critically, the decision should be based on whether the complained of 'event ... prevented the [party] from receiving a fundamentally fair trial.'") (*quoting Commonwealth v. Scott*, 12 S.W.3d 682, 685 (Ky.2000)). "And, the court must always assess if the parties' interest in seeing the first trial through to a verdict [is] outweighed by competing and equally legitimate demand for [protection of the parties' rights and] public justice." *Radford*, 212 S.W.3d at 80 (*quoting Scott*, 12 S.W.3d at 685) (internal quotation marks omitted).

When weighing the interests involved, we cannot conclude that the trial court abused its discretion. When the Commonwealth's Attorney received the letter—at the end of the sixth day of trial—he alerted the local law enforcement authorities. The Administrative Office of the Courts was also notified and the trial judge alerted court security officers. Given that the source of the letter was unknown, all necessary steps were taken to ensure the safety of all the parties and the spectators. Granting a mistrial would have erased not only the trial preparations—including subpoenaed witnesses—of both parties, but would have also erased six days of work in choosing a death-penalty-qualified jury. We cannot say that the trial court abused its discretion in concluding that "the parties' interest in seeing the first trial through to a verdict [is] outweighed by competing and equally legitimate demand for [protection of the parties' rights and] public justice." *Id.* Indeed, we do not believe Appellant's Sixth Amendment rights were violated either by being re-

quired to proceed with trial in the face of one threatening letter from an unknown source or otherwise.

▇▇▇ Appellant correctly notes that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). He fails to explain, however, how he was denied this right. It seems to us after an exhaustive review of the record that despite the letter's contents, counsel defended Appellant against the Commonwealth's accusations competently, thoroughly, and admirably. Thus, we cannot say that the trial court clearly abused its discretion by concluding a mistrial was not manifestly necessary; that conclusion is not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

### 2. *Denial of Motion for Change of Venue was not Abuse of Discretion.*

▇▇▇ With respect to the change of venue, Appellant argues that he was denied due process by being tried among an inflamed community atmosphere which precluded the seating of an impartial jury. *See Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Appellant claims that even though there was "a surface indicia of impartiality from prospective jurors, that indicia must be disregarded ... [because] 'the general atmosphere in the community or courtroom [was] sufficiently inflammatory'" to grant a change of venue. *Quoting Murphy v. Florida*, 421 U.S. 794, 802, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

In *Sheppard v. Maxwell*, the U.S. Supreme Court held that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Additionally, KRS 452.210 provides:

When a criminal or penal action is pending in any Circuit Court, the judge thereof shall, upon the application of the defendant or of the state, order the trial to be held in some adjacent county to which there is no valid objection, if it appears that the defendant or the state cannot have a fair trial in the county where the prosecution is pending. If the judge is satisfied that a fair trial cannot be had in an adjacent county, he may order the trial to be had in the most convenient county in which a fair trial can be had.

Appellant argues that he could not receive a fair trial in Livingston County. We disagree.

There was evidence that *one* anonymous person—who may or may not have been a member of the community in which Appellant was being tried—was unhappy that our system of justice entitles Appellant to a fair trial before he may be sentenced to death. Without more, one miscreant member of the community cannot dictate where a criminal defendant is tried, especially when that member of the community has shown complete disregard for the American and Kentucky systems of justice by threatening a trial court, an accused, and/or his attorneys. Appellant had already been granted a change of venue from Trigg County to Livingston County upon joint motion of the Commonwealth and defense counsel. Other than this one letter, there was no evidence, much less a "reasonable likelihood," *Sheppard*, 384 U.S. at 363, 86 S.Ct. 1507, that defendant could not receive a fair trial in Livingston County. Indeed, upon defense counsel's argument that the letter's author may

have contacted individual jurors, the trial court questioned the jury to ensure nobody had attempted to influence their decisions. Although Appellant alleges that voir dire "is not always adequate to effectuate the constitutional guarantee," *Groppi v. Wisconsin*, 400 U.S. 505, 510, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971), we hold that it *was* sufficient in this case where the community outrage was evidenced only by this one anonymous letter.

Thus, we hold that the trial court did not abuse its discretion in denying Appellant's motions for a mistrial and change of venue. Simply put, the letter did not prevent Appellant "from receiving a fundamentally fair trial." *Radford*, 212 S.W.3d at 80.

## J. The Trial Court's Mitigating Circumstances Instruction was Proper.

■ Appellant next argues that the mitigating circumstances instruction was unconstitutional because, when read in context with the instructions as a whole, it required the jury to be unanimous in its findings of any mitigating circumstances. This issue is unpreserved.

The mitigating circumstances instruction in this case provided:

> In fixing a sentence for the Defendant, Kevin Wayne Dunlap, for the offense of Murder[/Kidnapping], you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true:
>
> A. The Defendant has no significant history of prior criminal activity.
>
> B. At the time of the offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental ill-

ness, even though the impairment of the capacity of the Defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law was insufficient to constitute a defense to the crime.

> C. Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

> In addition to the foregoing, you shall consider also those aspects of the Defendant's character, and those facts and circumstances of the particular offense to which he has admitted his guilt, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true.

Appellant alleges that there is a substantial probability that the jury understood the term "you" to mean "the entire jury unanimously" because most of the other uses of the term "you" in the jury instructions refer to the jury in the collective. Similar arguments were considered, and rejected, in several previous cases. *See Meece*, 348 S.W.3d at 719; *Hunt v. Commonwealth*, 304 S.W.3d 15, 50 (2009); *Soto*, 139 S.W.3d at 870; *Caudill v. Commonwealth*, 120 S.W.3d 635, 674 (2003); *Bowling*, 873 S.W.2d at 180. " 'The instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous.' " *Hunt*, 304 S.W.3d at 50 (*quoting Mills*, 996 S.W.2d at 492 (*citing Bowling*, 873 S.W.2d at 180)).

We also note that during his closing argument defense counsel specifically told the jury that it did *not* have to be unanimous in deciding whether something was or was not mitigating: "Each one of you

makes your own decision as to whether something in the evidence, something about [Appellant] is mitigating. It doesn't matter whether the other eleven jurors don't agree with you. That's okay. With mitigating circumstances, you don't all have to agree. It's what to *you personally* is mitigating. A reason *you* think should be considered in determining whether he should die or not. You don't have to be unanimous." That the jury could have thought it must be unanimous as to mitigators after this explanation is far from "substantially probable"; in fact, we think it completely unlikely. Appellant's argument is therefore without merit.

## K. Trial Court's Aggravating Circumstances Instruction does not Constitute Prejudicial Error.

 Appellant next argues that he was deprived of his right to a unanimous verdict because the aggravating circumstances instruction presented alternate theories—arson, burglary, rape, or murder—and one of those theories, rape, "is totally unsupported by the evidence." This issue is unpreserved;[33] we therefore must determine (1) whether an error occurred, (2) if so, was there a reasonable explanation for defense counsel's failure to object, and (3) if no reasonable explanation exists, was the error prejudicial. *Sanders,* 801 S.W.2d at 668.

Appellant cites us to a footnote from this Court's 1980 opinion in *Gall v. Commonwealth,* where we construed "the statutory language of KRS 532.025(2)(a) pertaining to rape as meaning that the murder was committed incident to a rape, as distinguished from its having been committed during the physical act of sexual intercourse." 607 S.W.2d at 122 n. 10. Then, citing to www.dictionary.com, he explains that *incident* is defined as "resulting from." Thus, he argues that "the kidnapping and murders of the three children were in no way incidental to—that is, resulting from—the rape of Kristy Frensley, which occurred in a separate room." And, he continues, there is no way to know whether each juror based his or her finding upon a qualifying prior conviction (e.g., arson, burglary, murder), or the unqualified rape conviction when they found the aggravator.

 First, we look to Appellant's argument, which rests in large part upon a very selective (and restrictive) definition of the word *incident. Black's Law Dictionary* (9th ed. 2009) defines *incident* as "[d]ependent upon, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." Clearly, Kristy's rape was an act "subordinate to ... or otherwise connected with" the kidnapping and murder of her children in the sense that it was one heinous event in a continuing course of horrific conduct.

---

**33.** Appellant contends that this issue is partially preserved because his proposed verdict forms required the jury to specifically write which aggravating factor(s) it found existed beyond a reasonable doubt. However, Appellant concedes that his proposed instructions also included rape as an aggravating circumstance. Thus, we have a situation in which the jury, under Appellant's own proposed instructions, could have found rape as an aggravating factor (which he now contends is improper), but if it did so find we would at least know it did so unanimously.

RCr 9.54(2) provides: "No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection." We conclude that Appellant's proposed instructions did not "fairly and adequately" bring the unanimity issue—the issue about which he now complains—to the attention of the trial court.

In fact, as the Commonwealth points out, it could be argued that the murders, attempted murder, and arson—which were subsequent to the rape—were committed in part to cover up Appellant's crimes, while the kidnappings were committed to create his opportunity to rape. In any event, the evidence supports a finding that the murders and kidnappings were "incident" to the rape. Thus, rape was a qualified aggravating circumstance.

 Secondly, we consider whether the instructions create a unanimity issue violating Appellant's rights under Section 7 of the Kentucky Constitution. *See, e.g., Wells v. Commonwealth*, 561 S.W.2d 85, 87 (Ky.1978) ("Section 7 of the Kentucky Constitution requires a unanimous verdict reached by a jury of twelve persons in all criminal cases."). Admittedly, this Court has recently expanded its unanimous verdict jurisprudence. *See Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky.2013); *Kingrey v. Commonwealth*, 396 S.W.3d 824 (Ky.2013). However, *Johnson* and *Kingrey* are distinguishable in that they dealt with a scenario involving multiple instances of a crime under a single count, *i.e.*, where one "general jury verdict [is] based on an instruction including two or more separate instances of a criminal offense." *Johnson*, 405 S.W.3d at 449. In

these types of cases, the jury instruction allows the jury to find the defendant guilty of one count of Crime X, but the indictment alleges an extended occurrence time, say June 2009 through July 2010, and the facts establish that the defendant committed two crimes, one on Date 1 and one on Date 2; a guilty verdict establishes that each juror believed that the defendant committed Crime X, but it is unclear whether they unanimously agreed that he committed it on Date 1 and/or Date 2, during the relevant occurrence period.

Here, we have a situation in which the instructions permit the jury to find aggravating circumstances based upon arson, burglary, or rape for the murder charges, and arson, burglary, rape, or murder for the kidnapping charges, but it is unclear from the verdict forms whether the jury unanimously based its verdict upon the same aggravator or aggravators.[34] We do not find, however, that this causes a unanimity error. In *Hudson v. Commonwealth*, we held that an analogous instruction did not create a unanimity error. 979 S.W.2d 106, 109 (Ky.1998). In that case, the jury instruction, based upon Cooper's *Kentucky Instructions to Juries (Criminal)* § 3.24, provided that a murder conviction could rest upon an "intentional" or "wanton" *mens rea:*

**34.** The verdict form for Murder provides, in relevant part:

> We, the jury, find beyond a reasonable doubt that the following aggravating circumstance or circumstances exist in this case:
> a. The offense of Murder was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, or rape in the First Degree.
>
> ✓___ yes ___ no
> /s/_____
> Foreperson
>
> b. The Defendant's act or acts of killing were intentional and resulted in multiple deaths.

> ✓___ yes ___ no
> /s/_____
> Foreperson

The verdict form for Kidnapping provides, in relevant part:

> We, the jury, find beyond a reasonable doubt that the following aggravating circumstances exist in this case:
> a. The offense of Kidnapping was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, Rape in the First Degree, or Murder in the First Degree.
>
> ✓___ yes ___ no
> /s/_____
> Foreperson

*INSTRUCTION NO. 1—MURDER*

You will find the defendant guilty of Murder under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

. . . .

(B) That in so doing:

(1) he caused the death of Mary Elizabeth Thompson intentionally

OR

(2) he was wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of Mary Elizabeth Thompson under circumstances manifesting an extreme indifference to human life.

*Id.* We held that this instruction did not create a unanimity error because both theories, intentionality and wantonness, were supported by the evidence and resulted in the same crime. *Id.* at 110. Thus, whereas *Johnson* and *Kingrey* deal with jury instructions regarding multiple *instances* of the same crime, *Hudson* deals with multiple *theories,* all of which support a conviction for the same offense and are therefore punishable by the same penalties. *See also Benjamin v. Commonwealth,* 266 S.W.3d 775, 784–85 (Ky.2008); *Wells v. Commonwealth,* 561 S.W.2d 85, 88 (1978). Appellant's aggravating circumstances instruction is arguably more like the murder instructions in *Hudson, Benjamin,* and *Wells* in that the different acts, *i.e.,* arson, burglary, rape, and murder, are all different "theories" that support a conviction of the same "offense," *i.e.,* the aggravating circumstance.

 Even if we were to decide (which we do not) that this would create a unanimity error, we still could not conclude that such error would be prejudicial. *See Sanders,* 801 S.W.2d at 668. First, Appellant's guilty pleas are sufficient by themselves to establish the existence of the aggravating circumstances. With respect to the first aggravating circumstance for the murder conviction: "The offense of Murder was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, or Rape the First Degree" was satisfied by his respective guilty pleas to those three crimes. With respect to the aggravating circumstance for the kidnapping conviction: "The offense of kidnapping was committed while the Defendant was engaged in Arson in the First Degree, Burglary in the First Degree, Rape the First Degree, or Murder in the First Degree" was satisfied by Appellant's respective guilty pleas to those crimes. Thus, there is a virtual certainty that, under the facts of this case, the jury unanimously found that those aggravating circumstances existed beyond a reasonable doubt.

Second, with respect to the three murder convictions, the jury found a second, separate and independent aggravating circumstance to exist in which no unanimity issue is alleged (or possible): "The Defendant's act or acts of killing were intentional and resulted in multiple deaths." *See* note 34, *supra.* Thus, even if we threw out the instruction to which Appellant now assigns unanimity error, the jury's death penalty recommendation would still rest upon an independent aggravator, found to exist beyond a reasonable doubt with regard to the three murders. Accordingly, we cannot conclude that "minus the error, . . . the death penalty may not have been imposed." *Sanders,* 801 S.W.2d at 668.

**L. The Jury Instructions did not Deny Appellant Due Process or Reliable Sentencing.**

Appellant next argues that that the penalty phase jury instructions denied him reliable capital sentencing, and violated his right to a fair trial and due process. He assigns seven separate errors to the jury instructions; we will address each in turn.

### 1. The Trial Court did not Err by Failing to Instruct on a Non–Death Sentence.

Appellant argues that the trial court erred by failing to instruct the jury that a non-death verdict was possible even if it found aggravating circumstances existed. This issue is unpreserved.[35]

First, the jury instructions and verdict forms comport with *Kentucky Instructions to Juries (Criminal)* § 12.10 (rev. 5th ed. Cooper 2012). "[W]e do not deem the use of [Section 12.10] to be reversible error." *Caudill*, 120 S.W.3d at 675. *See also Hodge*, 17 S.W.3d at 854; *Foley v. Commonwealth*, 942 S.W.2d 876, 888 (Ky. 1996).[36] Second, the trial court specifically explained to the jury that with respect to

> [t]he last three [potential sentences] I read, it says: "If you answered Yes" to any one item under Aggravating Circumstances, you *may* impose those last three [*i.e.*, LWOP, LWOP 25, or death], but you do not *have to* impose *any* of those last three if you do find one or more of the aggravating circumstances. In other words, to fix either of those last three [sentences], you must find beyond a reasonable doubt either of the aggravators, but that does not limit your choices for the sentencing; you still have all five options [including a term of years or life imprisonment], even if you find an aggravating factor.

Clearly, then, Appellant's argument is without merit.

### 2. The Trial Court's Reasonable Doubt Instruction was Proper.

Appellant next argues that the trial court's reasonable doubt instruction invaded the province of the jury and caused it to believe that it *must* impose the death penalty *unless* there was a reasonable doubt that death was the appropriate punishment. We have previously considered, and rejected, this argument. *See Parrish v. Commonwealth*, 121 S.W.3d 198, 206 (Ky. 2003) ("The abstract analysis urged by Parrish is logically flawed. The mechanics of the argument resemble a tautology in that it is composed of simpler statements in a fashion that makes it seem true whether the simpler statements are true or false."), *overruled on other grounds by Brown*, 313 S.W.3d 577. The instructions provide: "If upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment." Considering an identical instruction in *Parrish*, we concluded: "These instructions do not violate the statutory system, nor do they invade the province of the jury." *Id.* Thus, Appellant's argument is without merit.

### 3. The Trial Court was not Required to Instruct the Jury that the Death Penalty Would be Carried Out by Lethal Injection or that Appellant Would not be Eligible for Parole.

Appellant next argues that the trial court should have instructed the jury that

---

**35.** Although Appellant cites us to a bench conference in which he believes he preserved this issue, defense counsel's actual objection was that the instruction would cause the jury to believe that it would have to impose a penalty of death, life without the possibility of parole (LWOP), or life without the possibility of parole for at least twenty-five years (LWOP 25) if it found an aggravator to exist. Accordingly, the objection itself recognized that the instructions, as tendered, could lead a reasonable juror to impose a sentence of less-than-death.

**36.** The Fifth Edition of *Kentucky Instructions to Juries* has an identical Section 12.10 as its Fourth Edition, which was the edition we cited in *Caudill, Hodge,* and *Foley,* and which was the most current edition at the time of trial in the case at bar.

if it sentenced Appellant to death he would be killed by means of lethal injection, and that "death means death." This issue is unpreserved. Appellant also argues that the trial court should have instructed the jury that Appellant would not be eligible for parole. This issue is preserved.

 Appellant cites us to no authority supporting the argument that the jury should have been instructed that a death sentence would be carried out by means of lethal injection. And,

> [p]lainly, a jury need not be told that "death means death," or that a condemned inmate is not eligible for parole, or that life without. the possibility of parole for twenty-five years means what it says. *People v. Smith,* 30 Cal.4th 581, 134 Cal.Rptr.2d 1, 68 P.3d 302, 339 (2003); *State v. Bush,* 942 S.W.2d 489, 522–23 (Tenn.1997); *State v. Jones,* 474 So.2d 919 (La.1985); *State v. Brown,* 306 N.C. 151, 293 S.E.2d 569 (1982). We should "give the jury some credit for having some amount of common sense." *People v. Marlow,* 34 Cal.4th 131, 17 Cal.Rptr.3d 825, 96 P.3d 126, 140 (2004). Moreover, we would point out that KRS 532.025 "does not allow the jury to hear information on parole eligibility." *Chumbler v. Commonwealth,* 905 S.W.2d 488, 497 (Ky.1995). *See also Perdue v. Commonwealth,* 916 S.W.2d 148, 163 (Ky.1995) ("[U]nder KRS 532.025, when the death penalty is sought, evidence of minimum parole eligibility guidelines may not be introduced at all."). We find no error here.

*Meece,* 348 S.W.3d at 722. Our position remains unchanged.

### 4. The Trial Court did not Err by Failing to Instruct the Jury on Non–Statutory Aggravators.

Appellant next argues that the trial court erred by failing to instruct the jury

to make findings concerning non-statutory aggravating circumstances. This issue is vague and unpreserved.

To begin with, it is entirely unclear why Appellant would want a jury to be instructed that it could consider non-statutory aggravators in addition to statutory aggravators. It seems to us that the fewer aggravators under consideration, the less likely it is he will receive an enhanced sentence. And even if we were to deem this to be error, we fail to perceive how it could have been prejudicial. Appellant received six death sentences based upon the jury's finding of *statutory* aggravators; how he possibly could have been prejudiced by the trial court's failure to instruct the jury that an enhanced sentence could *also* be imposed upon a finding of *non-*statutory aggravating circumstances escapes us.

 In any event, Appellant is incorrect in arguing that a death sentence may rest upon a finding of non-statutory aggravating circumstances. Although he contends that this was our holding in *Jacobs v. Commonwealth,* 870 S.W.2d 412, 419 (Ky.1994), we do not read *Jacobs* to stand for that proposition. And even if *Jacobs* did so hold, it would have been superseded by our more recent pronouncement in *Hunt* where we rejected the very argument Appellant is making here:

> Hunt's argument is based upon a faulty premise. The death penalty may not be imposed without a finding of a statutory aggravating factor beyond a reasonable doubt. As we stated in *Young v. Commonwealth,* 50 S.W.3d 148 (Ky.2001), "[a]bsent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty." *Id.* at 162.

304 S.W.3d at 51. *See also Meece,* 348 S.W.3d at 720. Appellant's argument is therefore without merit.

### 5. The Jury was not Required to Make Written Findings of Mitigating Circumstances.

 Appellant next argues that the jury instructions were erroneous because they failed to require the jury to prepare written mitigation findings. This issue is unpreserved. In *Smith v. Commonwealth,* 599 S.W.2d 900 (Ky.1980), defense counsel tendered an instruction along these lines and this Court held it was not error for the trial court to reject the instruction. *Id.* at 912. Appellant therefore urges us to overrule *Smith.* Finding no compelling reason to do so, we decline his invitation and repeat: "There is no requirement that the jury make written findings on mitigation." *Skaggs,* 694 S.W.2d at 680.

### 6. The Trial Court did not Err by Failing to Instruct the Jury that it Could not Impose Death Sentence Out of Passion or Prejudice.

Appellant next argues that an instruction "informing the jury that a death sentence cannot be imposed simply because of passion or prejudice should have been given." This issue is unpreserved. KRS 532.075(3)(a), however, requires this Court to determine whether a death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary fac-

tor...." Moreover, we have previously stated that "[a]n instruction to the jury to avoid passion or prejudice in fixing the death penalty is not required" during the penalty phase of a capital murder trial. *Mills,* 996 S.W.2d at 493. Thus, no instructional error occurred. *See Meece,* 348 S.W.3d at 723.

### 7. The Trial Court did not Err by Failing to Define Mitigation or the Standard of Proof Regarding Mitigation.

Appellant next argues that the trial court failed to (1) define *mitigating circumstances* and (2) specify the standard of proof regarding mitigation. He contends that by failing to explain to the jury that it could find a mitigating factor if supported by "any evidence," by a "preponderance of the evidence," or "if you believe it to be true," there is "more than a substantial probability that the jurors erroneously believe[d] the burden is on a defendant to prove a mitigating factor beyond a reasonable doubt." This issue was preserved by Appellant's proposed jury instructions. RCr 9.54(2).[37]

With respect to mitigating circumstances, the jury was instructed as follows:

In fixing a sentence for the Defendant, Kevin Wayne Dunlap, for the offense of Murder[/Kidnapping], you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and

---

**37.** RCr 9.54(2) provides, in relevant part: "No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction...."

The jury instructions Appellant proposed provide, in relevant part:

Mitigating circumstances are any facts or factors about Kevin Dunlap, the crime, or the case which do not justify or excuse the offense but which in fairness and mercy

lessen or reduce his responsibility or moral culpability for the crime, or which demonstrate that he is someone whose past or present circumstances indicate that he should receive a penalty other than death.

In fixing a sentence ... you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true.

Thus, we hold this proposed instruction sufficiently preserved the issue.

you believe to be true, including but not limited to such of the following as you believe from the evidence to be true:

A. The Defendant has no significant history of prior criminal activity.

B. At the time of the offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, even though the impairment of the capacity of the Defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law was insufficient to constitute a defense to the crime.

C. Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

In addition to the foregoing, you shall consider also those aspects of the Defendant's character, and those facts and circumstances of the particular offense to which he has admitted his guilt, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true.

We conclude that the trial court's instructions were adequate.

■■■ With respect to the argument that the instructions lack a sufficient definition, there is no constitutional requirement "to provide a formal definition of mitigating circumstances or their function." *Tamme v. Commonwealth*, 973 S.W.2d 13, 37 (Ky. 1998). " 'Jury instructions at the sentence stage of a capital trial need not include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances.' " *Id.* (*quoting Waters v. Thomas*, 46 F.3d 1506, 1528 (11th Cir.1995)).

■■■ With respect to the argument that the instructions fail to offer a standard of proof, "[s]ince a jury is not required to make findings with regards to mitigators, but only to consider them, there is no need to define the standard of proof." *Tamme*, 973 S.W.2d at 38. *See also Stopher*, 57 S.W.3d at 804. And, in any event, the trial court's instructions and Appellant's proposed instructions use an *identical* "standard"; both provide that the jury "shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true...." *See* note 38, *supra*. Appellant is not entitled to relief on this issue.

In sum, Appellant was not denied due process, a fair penalty hearing, or reliable sentencing by the trial court's instructions to the jury.

**M. Appellant was not Denied Due Process by Use of Aggravators not Considered by a Grand Jury or Alleged in his Indictment.**

Appellant next argues that he was denied due process when the trial court enhanced his sentence using aggravating circumstances not presented to a grand jury or charged in his indictment. He contends that the U.S. Supreme Court's decisions in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), require that aggravating circumstances be charged in the indictment if the prosecution wants to use them to increase punishment. We have previously considered, and rejected, this very argument. *See, e.g., Hunt*, 304 S.W.3d at 54; *Ernst v. Commonwealth*, 160 S.W.3d 744, 752 (Ky.2005); *Soto*, 139

S.W.3d at 841. We see no compelling reason to depart from our settled position that the indictment need not recite the aggravating circumstances, or to impose a new requirement that aggravating circumstances must be presented to the grand jury.

## N. Convictions for Murder and Capital Kidnapping of Same Victims do not Violate Double Jeopardy.

Appellant next argues that his rights to be free from being placed in double jeopardy and from being punished twice for the same conduct was violated when (1) he was convicted of murder and capital kidnapping based on the same killing of the same victim, and (2) that same murder was used as an aggravating circumstance to enhance his kidnapping sentence to make him death-eligible, *i.e.*, "double enhancement." He contends that these scenarios violate his rights under the double jeopardy clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 787, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), as well as his Eighth Amendment right to be free of cruel and unusual punishments. *See also* Ky. Const. §§ 13, 17. This issue is unpreserved.

We have previously considered, and rejected, both of Appellant's arguments. With respect to the argument that one cannot be convicted of both murder and capital kidnapping based upon the same killing of the same victim, see *St. Clair v. Roark*, 10 S.W.3d 482, 487 (Ky.1999).[38] *See also Jacobs*, 58 S.W.3d at 438; *Harris*, 793 S.W.2d at 805–06. With respect to the argument that a murder may not be used as an aggravating circumstance to enhance a kidnapping penalty, see *St. Clair*, 10 S.W.3d at 487. *See also Furnish*, 267 S.W.3d at 666 ("It is not double jeopardy to impose a separate penalty for one offense while using the same offense as an aggravating circumstance authorizing imposition of capital punishment for another offense.") (citation and internal quotation marks omitted); *Woodall*, 63 S.W.3d at 132; *Perdue v. Commonwealth*, 916 S.W.2d 148, 161 (Ky.1995).

## O. Reciprocal Use Of "Multiple Murder" Aggravator is Constitutional.

Appellant next argues that the jury's "duplicative use of several aggravators" to support the death sentence for each of the three murder convictions was improper. Specifically, he contends that the doctrine of "mutually supporting aggravating circumstances" precludes the imposition of multiple death sentences based on the reciprocal use of the aggravator of "multiple murder." He alleges that this practice violates the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution, and Sections 1, 2, 3, 11, 13, 17, and 26 of the Kentucky Constitution, as well as KRS 505.020. This issue is unpreserved.

Essentially, Appellant argues that the statutory aggravator found in KRS 532.025(2)(a)6.—"The offender's act or acts of killing were intentional and resulted in multiple deaths"—is unconstitutional. We have previously held that this provision is constitutional. *Bowling v. Commonwealth*, 942 S.W.2d 293, 305 (Ky.1997), *overruled on other grounds by McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky.2011); *Bowling*, 873 S.W.2d at 181; *Simmons v.*

---

**38.** Appellant insists that our conclusion in *St. Clair* was erroneous, and that we should return to the interpretation of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) espoused by this Court in *Cosby v. Commonwealth*, 776 S.W.2d 367 (Ky. 1989), *overruled by St. Clair*, 10 S.W.3d at 487. Our view, however, remains unchanged.

*Commonwealth,* 746 S.W.2d 393, 398–99 (Ky.1988). Our position remains unchanged.

### P. Convictions Serving as Aggravators for Death Penalty Do Not Violate Double Jeopardy.

Appellant next argues that the trial court violated the Fifth Amendment's prohibition against double jeopardy when it used his convictions for arson, burglary, rape, and murder as the aggravating circumstances required to impose his death sentences. *See also* Ky. Const. § 13. This issue is unpreserved. However, we have previously considered, and rejected, Appellant's argument. *See Woodall,* 63 S.W.3d at 132; *Bowling,* 942 S.W.2d at 308; *Perdue,* 916 S.W.2d at 161; *Wilson v. Commonwealth,* 836 S.W.2d 872, 891 (Ky. 1992), *overruled on other grounds by St. Clair,* 10 S.W.3d at 487; *Sanders,* 801 S.W.2d at 682. The U.S. Supreme Court has also rejected this argument. *See Witte v. United States,* 515 U.S. 389, 398, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) ("[W]e specifically have rejected the claim that double jeopardy principles bar a later prosecution or punishment for criminal activity where that activity has been considered at sentencing for a separate crime."); *Williams v. Oklahoma,* 358 U.S. 576, 585–86, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959). Appellant is therefore not entitled to relief on this issue.

### Q. Death Penalty for Kidnapping that Leads to Death is not Cruel and Unusual Punishment.

Appellant next argues that imposing a death sentence for kidnapping that results in death violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See also* Ky. Const. § 13. We have previously considered, and rejected, Appellant's argument. *See Salinas v. Commonwealth,* 84 S.W.3d 913, 916 (Ky. 2002); *St. Clair,* 10 S.W.3d at 486. He contends, however, that because the majority of jurisdictions do not impose the death penalty for kidnapping that results in death,[39] evolving standards of decency, from which the Eighth Amendment "must draw its meaning," *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), dictate this punishment is cruel and unusual. We are not persuaded that Kentucky's status as a minority jurisdiction in this respect requires us to revisit our position. Appellant is not entitled to relief on these grounds.

### R. Death Penalty for the Mentally Ill is not Cruel and Unusual Punishment.

■ Appellant next argues that sentencing him to death violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See also* Ky. Const. § 17. Specifically, he contends that he is "mentally ill" and urges this Court to announce a new categorical bar to imposing the death penalty upon mentally ill persons. This issue was preserved by Appellant's motion titled "Motion to Exclude Death Penalty Because Defendant is Mentally Ill"; we will therefore assume for the sake of argument that Appellant suffers from a mental illness.

In a relatively recent, evolving line of cases, the U.S. Supreme Court has held that the Eighth and Fourteenth Amendments to the U.S. Constitution prohibit the

---

**39.** According to 2010 data from the U.S. Department of Justice, Colorado, Georgia, Idaho, Kentucky, and the federal government authorize the death penalty for kidnapping that results in death. *See* Tracy L. Snell, *Capital Punishment, 2010—Statistical Tables,* Table 1: Capital offenses, by state, 2010 (2011), *available at* http://bjs.gov/content/pub/pdf/cp10st.pdf (last visited April 23, 2013); 18 U.S.C. § 1201(a).

execution of a person who was under sixteen years of age at the time of his or her offense, *Thompson v. Oklahoma,* 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), who is mentally retarded, *Atkins v. Virginia,*[40] 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and who was under eighteen years of age at the time of his or her offense, *Roper v. Simmons,* 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Appellant argues that these cases dictate that the next logical step in our evolving standards of decency requires a prohibition against executing the mentally ill. We disagree.

We are not prepared to hold that mentally ill persons are categorically ineligible for the death penalty. To begin with, "[m]ental illnesses come in many forms; different illnesses may affect a defendant's moral responsibility or deterrability in different ways and to different degrees." *Ohio v. Hancock,* 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059 (2006). A categorical bar, applying equally to persons suffering from paranoid schizophrenia and bulimia, would be unwise.

Rather, we are persuaded by the reasoning in *Hancock,* where the Supreme Court of Ohio declined to establish a categorical bar to imposing the death penalty upon all persons with even *severe* mental illnesses. *Id.* It is better, we think, to acknowledge that like its Ohio counterpart, KRS 532.025(2)(b)

> permit[s] the judge and jury in a capital case to consider a defendant's mental illness as a mitigating factor, thus providing the individualized determination

that the Eighth Amendment requires in capital cases. [Appellant] asks us to establish a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case. To do as he suggests would be a significant extension of *Atkins.* [Appellant] has not made a persuasive argument that *Atkins* should be so extended.

*Id.* at 1059–60. Accordingly, even assuming Appellant is mentally ill, he is not entitled to relief on these grounds.

**S. Appellant's Death Sentences are not Arbitrary and Disproportionate.**

■ Appellant next argues that his death sentences are arbitrary and disproportionate in light of (1) the mitigating circumstances surrounding his crimes, and (2) other cases with similar offenses and aggravators in which the defendant did not receive the death penalty. Thus, he apparently alleges that his death sentences are cruel and unusual, U.S. Const. amend. XIII, XIV, Ky. Const. § 17, and violate his guarantee to equal protection of the law, U.S. Const. amend XIV. This issue is unpreserved.

Appellant first argues that his brain malformation, depression, anxiety disorder, history of substance and alcohol abuse, family circumstances, military service, and minimal criminal record provide sufficient mitigation to render his death sentences arbitrary and disproportionate. We disagree.

**40.** Although *Atkins* left to the states " 'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentence,' " 536 U.S. at 317, 122 S.Ct. 2242 (*quoting Ford v. Wainwright,* 477 U.S. 399, 405, 416–17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)), it provided some guidance by noting that "clinical defini-

tions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318, 122 S.Ct. 2242. The petitioner in *Atkins* was diagnosed as mildly mentally retarded with a full-scale IQ of 59.

To begin with, KRS 532.025 does not imply, as Appellant suggests, that the death penalty is reserved for cases in which aggravation *outweighs* the mitigation. Rather, KRS 532.025 requires the judge or jury to "consider" mitigating and aggravating circumstances, and authorizes the death penalty when an aggravating circumstance is found to exist beyond a reasonable doubt. *See Ordway v. Commonwealth*, 391 S.W.3d 762, 786 (Ky.2013) ("In large part, this allegation of error is an argument of semantics. Our use of the word 'weigh' does not suggest that a quantitative or qualitative comparison must be done of aggravating v. mitigating factors. It is simply a synonym for the word used in the statute: 'consider.' ").

Here, the jury found the following aggravating circumstances to exist with respect to all three murders: (1) "The offense of murder was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, or Rape in the First Degree, and (2) The Defendant's act or acts of killing were intentional and resulted in multiple deaths." Additionally, the jury found the following aggravating circumstance existed with respect to each capital kidnapping charge: "The offense of Kidnapping was committed while the Defendant was engaged in the commission of Arson in the First Degree, Burglary in the First Degree, Rape in the First Degree, or Murder in the First Degree." Clearly, then, the jury was authorized to recommend the death penalty.

In addition to the statutory aggravators, the heinousness of the crimes persuades us that the death sentence was neither arbitrary nor disproportionate. Appellant pled guilty to kidnapping three children, stabbing them to death, and setting their house on fire. He stabbed Ethan, a five-year-old child, nine times: twice in the chest (including one that penetrated his heart), five times in his left back, once in his right back, and once in his stomach. He stabbed Kortney, a fourteen-year-old child, four times: three times in her chest (penetrating her left lung) and once to the right side of her neck. He tied seventeen-year-old Kayla's hands and gagged her mouth before cutting her throat from ear to ear, deep enough that her trachea was visible. I this light, it strains logic to characterize Appellant's death sentences as "arbitrary." The Constitution does not require a sentencing jury to completely discount the heinousness of the crimes in favor of mitigating circumstances.

■ Moreover, as we recently recounted:

Lesser sentences imposed upon other defendants by a judge or jury are not relevant in determining the validity of a death sentence or other sentence. *See Marshall v. Commonwealth*, 60 S.W.3d 513, 523 (Ky.2001); *Caudill*, 120 S.W.3d at 672. Moreover, the finding of aggravating circumstances:

satisfies the Constitutional demands and "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not," *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980) (*quoting Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The statute not only provides "some 'common-sense core of meaning ... that criminal juries should be capable of understanding[,]' " *Tuilaepa* [*v. California* ], 512 U.S. [967, 114 S.Ct. 2630, 2632, 129 L.Ed.2d 750, 760 (1994) ] (*quoting Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976)) (White, J., concurring in judg-

ment), but, in our view, contains clear objective standards from which a jury may determine a defendant's eligibility for a capital sentence. Simply put, KRS 532.025(2)(a)(*l* ) does not permit "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," *Godfrey*, 446 U.S. at 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d at 407, which the constitution prohibits. *St. Clair*, 140 S.W.3d at 570.

*Meece*, 348 S.W.3d at 726. Here, the evidence was more than sufficient and the jury's findings supported a sentence of death. Thus, Appellant's death sentence was neither arbitrary nor disproportionate to the evidence adduced.

 Nor are we persuaded that Appellant's sentences are disproportionate in relation to similar crimes.

The Commonwealth, through its death penalty statutes, has established a proportionality review process. KRS 532.075(3)(c). Under KRS 532.075(1), "[w]henever the death penalty is imposed for a capital offense ... the sentence shall be reviewed on the record by the Supreme Court." Further, Subsection (3)(c) provides that "with regard to the sentence, [this] court shall determine ... [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

*Hunt*, 304 S.W.3d at 52. Appellant cites us to *Commonwealth v. Reyes*, 764 S.W.2d 62 (Ky.1989); *Sommers v. Commonwealth*, 843 S.W.2d 879 (Ky.1992); and *Commonwealth v. Phon*, 17 S.W.3d 106 (Ky.2000), as cases that involve individuals who " 'deserve' capital punishment as much, or more so than he [but] have escaped it." Appellant's argument is belied by the faulty premise that all heinous murders must be punished by death. To the contrary, "a jury can reject a death sentence for any (or no) reason at all." *Ordway*, 391 S.W.3d at 786.

In any event, pursuant to our statutory requirement, we have thoroughly reviewed the record and conclude that the death sentence rendered in this case was not imposed under the influence of prejudice, passion, or any other arbitrary factor. Nor is the sentence disproportionate to the penalty imposed in similar cases which we have reviewed. We paid particularly close attention to those cases involving multiple intentional murders, as listed in *Hodge*, 17 S.W.3d at 855, and those rendered subsequent to *Hodge*. *See Ordway*, 391 S.W.3d 762; *Meece*, 348 S.W.3d 627; *Chapman*, 265 S.W.3d 156; *Epperson v. Commonwealth*, 197 S.W.3d 46 (Ky.2006); *Soto*, 139 S.W.3d 827; *Garland v. Commonwealth*, 127 S.W.3d 529 (Ky.2003); *Wheeler v. Commonwealth*, 121 S.W.3d 173 (Ky.2003); *Parrish*, 121 S.W.3d 198; and *Osborne v. Commonwealth*, 43 S.W.3d 234 (Ky.2001). We have also considered the cases Appellant cited involving multiple murders that did not result in the death penalty. *See Phon*, 17 S.W.3d 106;[41] *Sommers*, 843 S.W.2d 879;[42] and *Reyes*, 764 S.W.2d 62.[43]

---

**41.** The appellant in *Phon* was sentenced to life without the possibility of parole for pleading guilty to two counts of murder, first degree assault, first degree robbery, and first degree burglary. 17 S.W.3d at 107.

**42.** The appellant in *Sommers* was sentenced to consecutive sentences of 500 years' impris-

onment for two murder convictions. 843 S.W.2d at 880.

**43.** *Reyes* is completely inapposite as it deals with a defendant who entered into a plea agreement under which he offered to testify against a co-defendant in exchange for the Commonwealth's promise not to seek the death penalty. 764 S.W.2d at 63.

After careful review, we conclude that Appellant's sentence is neither excessive nor disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

## T. Our Proportionality Review is Constitutional and Appellant is not Entitled to Access Our KRS 532.075(6) Data.

Appellant next assigns error to this Court's method of proportionality review. First, he contends that our proportionality review is flawed because it is limited to only those cases in which the death penalty was imposed, and not to all other "similar cases" in which death was not imposed; he also suggests that our review is limited to only those cases which have been affirmed on appeal. Second, he alleges that his inability to access data collected pursuant to KRS 532.075(6) violates various constitutional rights. We have previously considered, and rejected, both of these arguments. *See, e.g., Hunt,* 304 S.W.3d 15, 52 (Ky.2009).

For the sake of clarity and completeness, we repeat:

"Kentucky's proportionality review is constitutional and comports with statutory requirements and the federal Constitution." *Fields v. Commonwealth,* 274 S.W.3d 375, 419 (Ky.2008). We discern no reason to reevaluate this settled issue.

Moreover, "[t]here is no right to access this Court's KRS 532.075 review data." *Id.* (citing *Ex parte Farley,* 570 S.W.2d 617, 624 (Ky.1978)). *See also e.g., Epperson v. Commonwealth,* 197 S.W.3d 46, 63 (Ky.2006) ("The concerns expressed by Epperson about his inability to access the data are without merit. This Court does not use any secret data but simply compares one death penalty case with all the other cases in which the

death sentence was imposed after January 1, 1970."); *Harper v. Commonwealth,* 694 S.W.2d 665, 670–71 (Ky. 1985) ("For some reason, obscure to us, the Public Advocate keeps insisting on access to the data collected by this court under the provisions of KRS 532.075(6). We had thought that [*Ex parte Farley* ] settled this question. There is no articulated reason why the Public Advocate cannot assemble this data for use in capital cases. We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. The time and effort expended in arguing this point would suffice to compile all the data we consider."); *Stopher v. Commonwealth,* 57 S.W.3d 787, 807 (Ky.2001) ("Failure to provide access to data collected by this Court pursuant to KRS 532.075(6) did not deny Appellant due process of law.").

*Id.* at 52–53. Accordingly, Appellant is not entitled to relief on this issue.

## U. The Death Penalty is Constitutional.

Appellant next contends—in five separate sub-arguments—that the death penalty is unconstitutional. We will address each argument in turn.

### 1. *KRS 532.025 is Constitutional.*

First, relying upon *Jacobs v. Commonwealth,* 870 S.W.2d 412 (Ky.1994), and *Harris v. Commonwealth,* 793 S.W.2d 802 (Ky.1990), Appellant argues that KRS 532.025 is unconstitutional in that it makes all murder defendants death eligible because murder is a capital offense. This, Appellant asserts, unhinges the Commonwealth's capital sentencing scheme from the procedural and constitutional controls on the decision-makers' judgments mandated by *Tuilaepa,* 512 U.S. 967, 114 S.Ct.

2630 (1994), and *Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188, (1993). This argument is without merit; as we stated in *Young*, 50 S.W.3d at 162, "[a]bsent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty."

**2. There is Adequate Statutory Guidance for Imposition of the Death Penalty in Kentucky.**

Appellant next argues that the statutory scheme by which he was sentenced to death provides no standards to guide the sentencer's decisions. In this respect, he makes several arguments—all of which we have previously rejected. Thus, we repeat what we have previously held:

> The constitutionality of the death penalty has been repeatedly recognized. *Thompson*, 147 S.W.3d at 55. Further, KRS 532.025 provides adequate standards to guide the jury in its consideration and imposition of the death penalty. *Hodge*, 17 S.W.3d at 854. Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky. *Tamme*, 973 S.W.2d at 40–41.

*Fields*, 274 S.W.3d at 419. Appellant is not entitled to relief on this issue.

**3. The Death Penalty is not Applied in a Discriminatory Manner in Kentucky.**

Appellant next argues that that the death penalty is applied in a discriminatory manner in Kentucky in that it is disproportionately imposed against African Americans and males. However, both this Court and the Sixth Circuit have rejected this argument. *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir.1996), *overruled on other grounds by In re Abdur' Rah-*

*man*, 392 F.3d 174 (6th Cir.2004); *Epperson*, 197 S.W.3d at 62–63. And, we are not persuaded to hold otherwise now.

We pause here to note, as did the Sixth Circuit in *McQueen*, that Appellant's "primary claim appears to be that the death penalty is disproportionately applied to blacks in the State of Kentucky." 99 F.3d at 1333. Because Appellant is white, "it is doubtful that [his] claim that the operation of Kentucky's death penalty statute is racially biased has anything other than an academic relevance to this case." *Id.*

**4. Prosecutorial Discretion does not Make Arbitrariness Inherent in Kentucky's Capital Sentencing Scheme.**

Appellant next argues that Kentucky's capital sentencing scheme is inherently arbitrary due to the alleged unlimited discretion enjoyed by prosecutors in determining whether to seek the death penalty in a given case. Again, we disagree and respond that "the death penalty is not imposed arbitrarily or capriciously in Kentucky." *Fields*, 274 S.W.3d at 419 (*citing Tamme*, 973 S.W.2d at 40–41); *see also Hunt*, 304 S.W.3d at 55.

**5. Concerns Over Executing the Innocent.**

Finally, Appellant argues that we should reconsider the constitutionality of the death penalty in light of the statistical data reflecting wrongful convictions in capital cases. We begin by noting that this request is somewhat disingenuous in Appellant's case considering he *pled guilty* to six capital offenses and DNA evidence supported this plea. Second, as we noted in *Meece*:

> In America, courts go to great lengths to protect the innocent and we do not stop with just one review as is evidenced by the statistics cited. With this history and review of process in mind, "prece-

dents of the [United States] Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent." *United States v. Quinones,* 313 F.3d 49, 63 (2d Cir.2002).

348 S.W.3d at 728. Thus, Appellant is not entitled to relief on this issue.

## V. Cumulative Error.

Appellant's final argument is that if we do not find any individual issue sufficient to require reversal, then we should set aside his convictions and sentences on the basis of the cumulative errors he has identified. Our review of the entire case reveals that Appellant received a fundamentally fair trial and that there is no cumulative effect or error that would mandate reversal. *See Bowling,* 942 S.W.2d at 308.

## IV. CONCLUSION.

For the foregoing reasons, the judgment and sentence of the Livingston Circuit Court is affirmed.

MINTON, C.J., ABRAMSON, KELLER, NOBLE, SCOTT, and VENTERS, JJ., sitting. All concur. CUNNINGHAM, J., not sitting.